No. 80,657
80,658

STATE OF KANSAS, *Appellee,* v. STEVEN WILSON and GLORIA
WILSON, *Appellants.*
(987 P.2d 1060)

Opinion filed July 9, 1999.

*Judy L. Simon*, of Kansas City, argued the cause, and was on the brief for appellant Gloria Wilson.

*Martin K. Wells*, of Kansas City, was on the brief for appellant Steven Wilson.

*Sheryl L. Lidtke*, assistant district attorney, argued the cause, *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: This is an appeal by Steven and Gloria Wilson of their convictions for endangering a child in violation of K.S.A. 21-3608. The Wilsons challenge (1) the constitutionality of K.S.A. 21-3608(a) on grounds of being vague, overbroad, and beyond the scope of the State's police power, (2) the trial court's interpretation of K.S.A. 21-3608(a), and (3) the sufficiency of the evidence.

All charges in this case arose from the events surrounding the abuse and neglect of then 5-year-old L.O. (born October 24, 1991), the daughter of S.O. and J.R. Several adults, many of whom were siblings or related by marriage, lived with their respective children in the same house as L.O. in Kansas City, Kansas. Among the adults living there in various rooms on different floors of the house were Gloria and Steven Wilson, who are married; Norman and Linda Randall, who are married; S.O. who stayed there with her boyfriend (who was not J.R.); and J.R. who lived there with his girlfriend. Gloria Wilson, Norman Randall, and J.R. are all siblings.

Gloria and Steven Wilson began living in the house in late February 1997 and were there in April 1997 when L.O. was removed by employees of the Department of Social and Rehabilitation Services (SRS). During that time, L.O. was neglected and verbally and physically abused by her mother and, to a lesser extent, Norman Randall, on a regular basis in various violent and sadistic ways. The

abuse occurred on a daily basis and in Steven and Gloria's presence.

Linda Randall testified that on one occasion, when S.O. was beating L.O. with a board, Steven took the board away and stomped on it and threatened to beat up S.O. Linda also testified that on one occasion, when S.O. had beaten L.O., Gloria beat up S.O. Linda also testified that Gloria called SRS several times to report the abuse of L.O., but SRS records did not substantiate this claim.

Although Gloria was L.O.'s paternal aunt, there was no evidence that Steven or Gloria ever took or were given responsibility for caring for L.O.

On April 28, 1997, SRS employees went to the house in response to a report made that day that L.O. had been severely abused. When the social workers arrived and asked about L.O.'s whereabouts, several individuals, including Gloria Wilson, falsely claimed that L.O. was not there. Someone in the group stated L.O. was in California, and no one attempted to correct this statement. When the social workers asked L.O.'s parents, S.O. and J.R., how long L.O. had been in California, the parents gave inconsistent responses. When the social workers asked for clarification, Gloria falsely asserted that L.O. had been gone for about a week to visit an aunt.

After determining they were not going to get any more information about L.O.'s whereabouts, the social workers left. However, they returned with the police and a warrant the next day to search the home for L.O.

L.O. was found upstairs, sitting quietly on the floor. Her head had been shaved, and there were patches on her head where no hair was growing. Her feet were extremely red and swollen. She was frail, extremely thin, very dirty, and reeked of urine. She had various scratches, bruises, and burn marks from head to toe, and all her fingers were swollen. L.O.'s feet hurt so much she had difficulty standing. She kept asking for water and something to eat.

After an officer carried L.O. downstairs, Steven Wilson began arguing with the police, either telling them they should not be there or asking why they were there. When asked by the police

why he had not reported L.O.'s condition to anyone, Steven responded that it was not his problem.

L.O. was taken to the hospital for treatment. She was underweight and ravenously hungry. She said the swelling in the joints of her fingers was from her mother bending back her fingers. The rest of her injuries L.O. described as variously attributable to blows, belt-beatings, scratches, cigarette burns, and paddling, primarily by her mother and to a lesser extent, by Norman Randall and "Big Linda" (an apparent reference to Linda Randall). Some injuries were in various stages of healing. There were also possible indications of sexual abuse. Testimony at trial further indicated that S.O. forced L.O. to stand in corners with her arms in the air for hours at a time, and that S.O. and Norman Randall handcuffed L.O. to a bed at night.

In a 22-count information, 11 defendants, including the Wilsons, were charged with various crimes in relation to the treatment of L.O. The Wilsons were each charged with one count of endangering a child in violation of K.S.A. 21-3608. Norman Randall pled guilty to attempted child abuse and Linda Randall pled guilty to child endangerment; the Randalls testified at the Wilsons' trial on behalf of the State.

Steven moved to dismiss and asserted he could not be convicted under the child endangerment statute, K.S.A. 21-3608, for failing to report L.O.'s abuse because he had no duty to report it under the child abuse and neglect reporting statute, K.S.A. 38-1522. At the hearing on the motion, Steven also argued that the language of K.S.A. 21-3608(a) which speaks of an offender "causing or permitting" a child to be placed in a situation of jeopardy presumes that the offender has some degree of charge or custody of the child, which he did not.

Steven's motion was denied by Judge Dexter Burdette, who noted, among other comments, that under *State v. Walker*, 244 Kan. 275, 281, 768 P.2d 290 (1989), there is no requirement that one charged under K.S.A. 21-3608 have an independent legal duty to the child.

Gloria moved to dismiss on grounds the language of the child endangerment statute is vague, overbroad, and exceeds the scope

of the police power. This motion was argued before Judge Thomas L. Boeding. At that time Steven joined in Gloria's motion and she incorporated the arguments from his earlier motion in her own. The trial court denied the motion to dismiss, and the case proceeded to a bench trial.

The State called seven witnesses at trial, including SRS workers, police officers, the hospital staff who treated L.O., and Norman and Linda Randall. Neither defendant presented evidence. After motions for acquittal were denied, the trial court rendered a memorandum decision, finding both Wilsons guilty.

The trial court found the Wilsons were adults living in the same house with L.O. and the abusers; Gloria is L.O.'s paternal aunt but neither defendant was a parent, step-parent, child care provider, or babysitter of L.O.; the continuous course of substantial and serious abuse occurred around them on a daily basis; the child's abused and deteriorated condition was obvious; and, on at least one occasion, each defendant stepped in to halt the abuse, but SRS records showed no evidence either ever reported it.

The trial court found the child endangerment statute focuses on the reasonableness of a defendant's actions rather than on any independent legal duty to the child. The court concluded the Wilsons had a responsibility under the unique circumstances of the case to "do something" to protect L.O. and a reasonable person under the circumstances would have reported the situation to the authorities and stopped the abuse sooner.

The Wilsons were each sentenced to 1-year in county jail and placed on 24 months' probation. As restitution, each was held jointly and severally responsible with the other house occupants for $614 of L.O.'s medical bills.

Steven and Gloria each appeal, raising identical issues.

*Is K.S.A. 21-3608(a) unconstitutionally vague, overbroad, or beyond the scope of the State's police power?*

We first consider the Wilsons' arguments that K.S.A. 21-3608(a) is unconstitutionally vague, overbroad, and beyond the scope of the State's police power on its face and as applied to the facts of this case.

The constitutionality of a statute is a question of law over which this court exercises unlimited review. *Lemuz v. Fieser*, 261 Kan. 936, Syl. ¶ 1, 933 P.2d 134 (1997). In *Peden v. Kansas Dept. of Revenue*, 261 Kan. 239, Syl. ¶ 2, 930 P.2d 1 (1996), *cert. denied* 137 L. Ed. 2d 1029 (1997), we stated the manner in which we view constitutional issues:

"A statute is presumed constitutional and all doubts must be resolved in favor of its validity. If there is any reasonable way to construe a statute as constitutionally valid, the court must do so. A statute must clearly violate the constitution before it may be struck down. This court not only has the authority, but also the duty, to construe a statute in such a manner that it is constitutional if the same can be done within the apparent intent of the legislature in passing the statute."

The Wilsons were convicted under K.S.A. 21-3608(a), which states:

"Endangering a child is intentionally and unreasonably causing or permitting a child under the age of 18 years to be placed in a situation in which the child's life, body or health may be injured or endangered."

Subsection (b) states a child is not endangered solely because the child's parent or guardian relies in good faith on spiritual healing for the treatment or cure of disease. Subsection (c) makes the crime of endangering a child a class A person misdemeanor.

The Wilsons' contention that K.S.A. 21-3608(a) is unconstitutionally vague is based on our holding in *State v. Kirby*, 222 Kan. 1, 563 P.2d 408 (1977), that the term "endangering of life" in a criminal injury to persons statute was unconstitutionally vague. In *Kirby*, we stated the test to determine whether a statute is void for vagueness:

"The test to determine whether a criminal statute is unconstitutionally void by reason of being vague and indefinite is whether its language conveys a sufficiently definite warning as to the conduct proscribed when measured by common understanding and practice. If a statute conveys this warning it is not void for vagueness. Conversely, a statute which either requires or forbids the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application is violative of due process." 222 Kan. 1, Syl. ¶ 1.

The Wilsons argue the endangering a child statute criminalizes omissions based on markedly indefinite standards. They also argue

that because the phrase "endangering of life" was found vague and ambiguous in *Kirby*, the existence of the word "endangering" causes K.S.A. 21-3608(a) to be likewise unconstitutionally vague.

The State more persuasively argues this issue has been determined by this court in *State v. Fisher*, 230 Kan. 192, 200, 631 P.2d 239 (1981), where we upheld the present language of K.S.A. 21-3608(a) (which was at that time found in subsection [b]) and concluded it was not unconstitutionally vague. We held:

"The purpose of K.S.A. 21-3608(1)(*b*) is salutary. It is to protect children, and to prevent their being placed where it is reasonably certain that injury will result. . . .

"The wording of the statute is broad, but the purpose is likewise broad; to prevent people from placing children in situations where their lives and bodies are obviously in imminent peril. The phrase 'or endangered' adds little, if anything to the statute; if a child is endangered, it may be injured; it is the likelihood of injury against which the statute speaks. We conclude that K.S.A. 21-3608(1)(*b*) is clear and understandable; that ordinary persons can determine what conduct is proscribed by a common-sense reading of the statute; that the statute conveys a sufficiently definite warning when measured by common understanding; and that it is not void for vagueness." 230 Kan. at 199-201.

We disagree with the Wilsons' contention that their argument differs from that made in *Fisher*. They argue a distinction without a difference. The *Fisher* rationale is still good law in Kansas. K.S.A. 21-3608(a) requires that the prohibited acts be unreasonable, the holdings from other states cited in *Fisher* upheld similar statutes against void for vagueness arguments, and the *Fisher* language dealing with the word "endangering" is controlling.

K.S.A. 21-3608(a) is not void for vagueness.

The Wilsons next argue K.S.A. 21-3608(a) is unconstitutionally overbroad. Vagueness and overbreadth are often confused. The difference between the two concepts was discussed in *State ex rel. Murray v. Palmgren*, 231 Kan. 524, 533, 646 P.2d 1091 (1982):

"While a vague statute leaves persons of common intelligence to guess at its meaning, an overbroad statute makes conduct punishable which under some circumstances is constitutionally protected. [Citations omitted.] Obviously, almost every law is potentially applicable to constitutionally protected acts. A successful overbreadth challenge can thus be made only when 1) the protected activity is a significant part of the law's target, and 2) there exists no satisfactory method of

severing that law's constitutional from its unconstitutional applications. [Citation omitted.]"

In *City of Wichita v. Wallace*, 246 Kan. 253, 264, 788 P.2d 270 (1990), this court quoted an explanation of the two concepts from 16A Am. Jur. 2d, Constitutional Law § 460, pp. 247-48, which stated:

" 'The distinction between the doctrines of overbreadth and vagueness is that the overbreadth doctrine is applicable primarily in the First Amendment area and may render void legislation which is lacking neither in clarity nor precision, whereas the vagueness doctrine is rested on the due process clauses of the Fifth and Fourteenth Amendments and is applicable solely to legislation which is lacking in clarity and precision.' "

The Wilsons claim that the statute prohibits conduct and activities which are lawful. Their example is of children being permitted by their parents to play football despite the great likelihood of injury.

The Wilsons' argument seems to relate more to vagueness than overbreadth. In any event, the argument is without merit. As noted in *Fisher*, child endangerment statutes like K.S.A. 21-3608 are necessarily drawn with broad language because they are designed to cover a broad range of conduct and circumstances. See *Fisher*, 230 Kan. 198, quoting with approval *Commonwealth v. Mack*, 467 Pa. 613, 359 A.2d 770 (1976).

As to the argument about permitting football to be played, our court in *Fisher*, 230 Kan. at 197, looked to the *People v. Beaugez*, 232 Cal. App. 2d 650, 658, 43 Cal. Rptr. 28 (1965), response that courts will not give strained meanings to legislative language through a process of imaginative hypothesizing; a common-sense interpretation of the statute is the guiding principle. See also *State v. Neighbors*, 21 Kan. App. 2d 824, 828-29, 908 P.2d 649 (1995) (where defendant argued a law prohibiting the sale of metal knuckles was overbroad, Court of Appeals noted that a person to whom a statute may be constitutionally applied may not generally rely on hypothetical situations involving rights of others or situations not before the court, except where the First Amendment rights of others are raised in an overbreadth argument).

Unless there were unique circumstances which would require a reasonable person to withhold permission, a common-sense interpretation of K.S.A. 21-3608(a) would foreclose prosecution for such parental acts as permitting a child to play football. K.S.A. 21-3608(a) only prohibits "unreasonably" permitting a child to be placed in dangerous circumstances. " 'Reasonable' and 'unreasonable' are words of common usage, readily understood. Reasonableness is used as a standard of conduct throughout our statutes and our jury instructions" as we clearly held in *Fisher*, 230 Kan. 193.

The Wilsons also argue that the statute is overbroad because, "[r]ather than inhibiting the possibility of expression of ideas, the statute . . . regulates and inhibits the manner or mode in which ideas are expressed." While they say they contacted the SRS, the trial court found they did not do so. In any case, this is a strained and unsuccessful attempt to fit the circumstances of this case into a typical overbreadth scenario by arguing that the statute infringed on the Wilsons' First Amendment freedoms. This argument has no merit.

Mixed with the Wilsons' overbreadth argument is the contention that the statute is unconstitutional as applied because the Wilsons had no duty to report the abuse of L.O. under K.S.A. 38-1522. While we will discuss the involvement of this reporting statute later, we see no valid argument as to how it can be applied to render the child endangerment statute unconstitutional.

We hold K.S.A. 21-3608(a) is not unconstitutionally overbroad.

The Wilsons next argue that K.S.A. 21-3608(a) unconstitutionally regulates conduct beyond the limits of the State's police power. Under its police power, the State is given a wide scope to enact laws to promote and protect the morals, health, security, and welfare of its people. *State v. Neighbors*, 21 Kan. App. 2d 824, 829, 908 P.2d 649 (1995), citing *Delight Wholesale Co. v. City of Prairie Village*, 208 Kan. 246, 249, 491 P.2d 910 (1971). The only limitation on the State's exercise of its police power is that the regulations must be actually directed at the welfare of society and must be fairly designed to protect the public against the evils sought to be avoided. "Within these limits the legislature is the sole judge of the

nature and extent of the measures necessary to accomplish its purpose." *City of Baxter Springs v. Bryant*, 226 Kan. 383, Syl. ¶ 5, 598 P.2d 1051 (1979).

The State has a compelling interest in the well-being of its children and particularly in their protection from all forms of cruelty, neglect, degradation, and inhumanity. *State ex rel. O'Sullivan v. Heart Ministries, Inc.*, 227 Kan. 244, Syl. ¶ 5, 607 P.2d 1102 (1980). The State's interest in protecting children is compelling, and K.S.A. 21-3608 is reasonably drawn to carry out that legislative purpose. The statute is within the valid exercise of the State's police powers.

*Does K.S.A. 21-3608(a) apply to individuals who are aware of child abuse and fail to sufficiently intervene absent a showing of their authority or control over the abuser and child?*

Having found K.S.A. 21-3608(a) constitutional we now turn to the Wilsons' argument that, properly construed, the statute's terms do not apply to them under the facts of this case. This requires an interpretation of the statute, which is a question of law over which this court exercises unlimited review. *State v. Lewis*, 263 Kan. 843, Syl. ¶ 1, 953 P.2d 1016 (1998). In doing so we recognize:

"A fundamental rule of statutory construction is that the intent of the legislature governs when that intent can be ascertained from the statute. When a statute is plain and unambiguous, an appellate court must give effect to the intention of the legislature rather than determine what the law should or should not be." *Lewis*, 263 Kan. 843, Syl. ¶ 2.

The central argument of the State's case was not that the Wilsons *caused* L.O. to be placed in a situation of danger, but rather that they *permitted* her to be placed in dangerous circumstances. The prosecution contended the Wilsons failed to do anything, whether it be reporting the abuse or taking other action to protect L.O. from her mother, and it is contended such inaction permitted L.O. to be criminally endangered.

This gives rise to the Wilsons' principal argument that the word "permitting" in K.S.A. 21-3608(a) necessarily presumes that the person charged must have had some measure of authority and/or control over the abuser and the child. Because they had no au-

thority or control over L.O. or her abusive mother they assert they were improperly charged and convicted.

Because the word "permit" is not statutorily defined, we look to the rule that "[w]ords and phrases shall be construed according to the context and approved usage of the language." K.S.A. 77-201, *Second*; *Galindo v. City of Coffeyville*, 256 Kan. 455, Syl. ¶ 5, 885 P.2d 1246 (1994).

The Wilsons state that the first definition of "permit" in Webster's New Twentieth Century Dictionary 1336 (2d ed. 1956) is to give permission to, to authorize, or to grant by express consent and that "permit," properly defined, thus necessarily requires an element of authority. They then recite the various definitions of "authorize" which we stated in *Smith v. Printup*, 254 Kan. 315, 339, 866 P.2d 985 (1993), where we considered employer authorization of tortious conduct by employees. In *Smith* we noted that "to authorize" can mean to endorse, to empower, or to permit as if by some recognized or proper authority.

While the State concedes that the definitions stated by the Wilsons are among the possible definitions of "permit," it argues that alternative meanings of "permit" include "to allow" or "to let happen" and that these latter connotations are those intended by K.S.A. 21-3608.

Black's Law Dictionary 1140 (6th ed. 1990) defines the verb "permit" as: "To suffer, allow, consent, let; to give leave or license; to acquiesce, by failure to prevent, or to expressly assent or agree to the doing of an act." The American Heritage Dictionary 924 (2d ed. 1985) defines "permit" as "1. To allow (something); consent to; tolerate. 2. To give consent; authorize. 3. To afford opportunity to."

In *City of Topeka v. Mayer*, 16 Kan. App. 2d 567, 570, 826 P.2d 527, *rev. denied* 250 Kan. 804 (1992), in interpreting the word "permit," the court stated: " 'To permit' commonly means to give consent, to authorize, to make possible, or to give an opportunity. See Webster's Third New International Dictionary 1683 (1986); Black's Law Dictionary 1140 (6th ed. 1990).' "

Under the various definitions stated above, the word "permit" can imply circumstances where one has power or control to au-

thorize an act or to give one's consent to a situation—the definition urged by the Wilsons. However, it can also imply circumstances where one acquiesces in the doing of a thing or the existence of a circumstance by failing to take action to prevent it or where one allows a thing to happen by not opposing it—the definition urged by the State. Under circumstances where a statute is susceptible of more than one meaning, the precept that criminal statutes should be strictly construed against the State, *State v. Lawson*, 261 Kan. 964, 966, 933 P.2d 684 (1997), weighs in favor of adopting the definition posed by the Wilsons.

The State would not require us to become mired in the semantics of the statute, but rather asks us here, as the trial court did, to look only to the broad expansive statement of *State v. Walker*, 244 Kan. 275, 281, 768 P.2d 290 (1989), where we said: "The statute [K.S.A. 21-3608(a)] does not require the State to prove that the offender had any independent legal duty to the victim, but only that the conduct was wilful and unreasonable." We believe this statement should be viewed in the factual context in which it was made.

In *Walker*, the stepmother of two young boys was convicted of two counts of aggravated criminal sodomy, two counts of endangering a child, and one count of making a terroristic threat. The stepmother cared for the children during the day while their father worked. The evidence showed that the stepmother forced the boys to perform oral sex on her; that she beat one of the children causing visible signs of injury; that she refused to seek medical attention for the children or to administer necessary medication even after teachers and SRS workers urged her to do so; and that she allowed the children to be underclothed, filthy, and hungry and to live in general squalor.

The stepmother argued there was insufficient evidence of wilfulness or unreasonableness on her part because, she asserted, as a stepparent, she had no legal duty to care for the children. This court found no merit in her contentions, stating:

"The statute does not require the State to prove that the offender had any independent legal duty to the victim, but only that the conduct was wilful and unreasonable. The appellant was the stepmother of the two boys and their daytime

caretaker. It was the jury's duty to determine whether the appellant's conduct toward her stepsons violated the statute, given her relationship to them." *Walker*, 244 Kan. 281.

If we view *Walker* as the trial court did, the omissions of the Wilsons greatly expand the scope of the statute from parents or caregivers to family members living where the abuse occurred. We believe it is important to understand that the statement was made in addressing Walker's claim that, as a mere *stepparent*, she had *no duty to care* for the children. Walker, in essence, made a totally untenable argument that because she was not legally required to care for the children, she could not be convicted of child endangerment despite her actions towards and actual relationship to the children, including her voluntary assumption of the role of caregiver. While neither of the Wilsons occupied the role of parent or caregiver to L.O., Walker did undertake to care for the children and had the duty to perform that function reasonably and, at the very least, not to create circumstances injurious to the children. Absent a special relationship, one generally has no legal duty to aid or care for another person; once a person steps into the role of caregiver, such that others are discouraged or precluded from filling that role, that person has a duty to act reasonably in fulfilling the adopted role. See LaFave and Scott, 1 Substantive Criminal Law § 3.3 (a)(1), (4), and (5) pp. 282-88 (1986).

Furthermore, in *Walker*, this court was faced with a person who actively *caused* many of the circumstances which endangered her stepchildren. Where one *causes* children to be placed in such circumstances, there is no need to ask whether that person "permitted" them to be placed in such circumstances in order to find liability under the child endangerment statute. As the children's stepmother and daytime caretaker, and as the individual involved in actively creating the injurious circumstances, the defendant in *Walker* had significant control over and responsibility for the children's circumstances. The holding of *Walker* must be considered in this light.

The predecessor to K.S.A. 21-3608 was K.S.A. 38-713, originally enacted as part of chapter 277 of the Laws of 1965 entitled Crimes Affecting Children. See L. 1965, ch. 277, § 5; *State v. Fisher*, 230

Kan. at 199. In 1969 the section was reworded, reorganized, and transferred to the criminal code as K.S.A. 21-3608. L. 1969, ch. 180, § 21-3608. The 1969 version had two separate subsections describing child endangerment, the first of which, then designated (a), was declared unconstitutionally vague by this court in *State v. Meinert*, 225 Kan. 816, 820, 594 P.2d 232 (1979). In 1992, the unconstitutional subsection (a) was removed by the legislature by L. 1992, ch. 298, § 36. Subsection (b) was redesignated (a) and the express requirement that the violator's actions be intentional was added. With the exception of certain technical and sentencing guidelines-related changes in 1993, the statute has remained the same since 1992.

The legislative history pertaining to the language of the 1969 enactment fails to shed any light on the issue we now face. However, our search into later proposed amendments to the statute revealed S.B. 231 (1989). In that bill, Senators Winter, Moran, and Oleen suggested amending the child endangerment statute to add an additional definition of child endangerment which included failure to report abuse of a child "by any adult member of a household, who has reason to believe such abuse occurred, when such abuse occurs to a child living within the same household caused by another adult." The Wilsons' conduct of failing to report the abuse of L.O. would have fallen squarely within the proposed amendment. The amendment was intended by Senator Winter to send "a message that abuse of a child in a household must be reported." Minutes of the House Committee on Judiciary, March 21, 1990.

Although the bill was passed by the Senate, it died in the House of Representatives. 1990 Senate House and Actions Report. The history of the bill, including committee minutes, does not reveal why the House decided to take no action on the bill. However, it is clear that when faced with the opportunity to announce a specific duty to report under the child endangerment statute, the House did not feel compelled to act.

The Wilsons' second argument in favor of their interpretation of K.S.A. 21-3608 relates to the limited duties imposed by the child abuse and neglect reporting statute, K.S.A. 38-1522. Because they had no duty to report the abuse of L.O. under the reporting statute,

they reason the legislature could hardly have intended to criminalize their failure to prevent or report abuse under K.S.A. 21-3608(a).

K.S.A. 38-1522(a) requires certain categories of professional persons (ranging from doctors and nurses to teachers and law enforcement officers) to report suspected abuse or neglect to SRS, a law enforcement agency, or the attorney general. Failure to report is a class B misdemeanor. K.S.A. 38-1522(f). K.S.A. 38-1522(b) states: "Any other person who has reason to suspect that a child has been injured as a result of physical, mental or emotional abuse or neglect or sexual abuse may report the matter as provided in subsection (c) [to SRS or law enforcement agency] or (e) [to the attorney general]." The Wilsons were not among those required to report the abuse and, therefore, under K.S.A. 38-1522(b), their reporting would have been merely permissive and their failure to report would not subject them to criminal liability under K.S.A. 38-1522(f).

The State contends the Wilsons' duty to do "something" to stop the abuse of L.O., whether by reporting or otherwise, is derived from the child endangerment statute. The State argues the fact the Wilsons had no duty to report the abuse under the reporting statute is completely irrelevant to the question of the interpretation of K.S.A. 21-3608.

We are not prepared to adopt the arguments of either party as being conclusive. The provisions of the reporting statute are not irrelevant but do not require the result the Wilsons suggest. It is presumed that legislative enactments are intended to operate in harmony. It is therefore troubling that the Wilsons would be criminally liable for failure to report abuse under K.S.A. 21-3608 when the legislature expressly avoided imposing such liability under K.S.A. 38-1522. See also S.B. 243 (1983 Session) (proposing an amendment to the reporting statute to expressly require reporting of "physical, mental or emotional abuse or neglect or sexual abuse [by] a parent, stepparent, grandparent, or stepgrandparent of the child or any person 18 or more years of age who is a sister, brother, stepsister, stepbrother, *aunt, uncle,* niece or nephew of the child." [Emphasis added.] [The bill died in committee]). This decision of

the legislature in K.S.A. 38-1522, coupled with the failure of the 1989 S.B. 231 referred to earlier, cautions us not to reach a construction which our legislature, faced with the opportunity of doing so, failed to adopt.

Resort to other states' interpretations of similar statutory language has failed to reveal any state which has adopted the expansive interpretation posed by the State in this case. Although virtually all other states have legislation designed to some extent to cover the conduct of allowing a child to be placed or to remain in dangerous or abusive circumstances, the wording of these statutes varies as does the scope of the conduct prohibited.

Under many statutes where criminal liability exists for permitting a child to be placed in dangerous circumstances or for leaving a child in circumstances injurious to life or health (as opposed to actually *causing* the child's suffering or the injurious circumstances), liability is expressly limited to parents, guardians, custodians, or caregivers. *See e.g.*, Alaska Stat. § 11.51.100(a) (1998); Ariz. Rev. Stat. Ann. §§ 13-3619 (1989) and 13-3623(B), (C) (1998 Supp); Del. Code Ann. tit. 11, § 1102(a)(1) (1998 Supp.); Fla. Stat. § 827.03(3)(a) (1998); Hawaii Rev. Stat. § 709-903.5(1) (1993); Ind. Code § 35-46-1-4(a) (1998); Iowa Code § 726.6 (1999); Minn. Stat. § 609.378 (1998); Nev. Rev. Stat. § 200.508(1) and (3)(b) and (c) (1998). *Cf.* Hawaii Rev. Stat. § 709-904(2) (1993) (extending liability to nonparents and noncustodians, but only when such persons "violat[e] or interfere with any legal duty of care or protection owed such minor").

Many statutes that *do not* expressly limit criminal liability to parents, custodians, or the like, employ wording or schemes of liability too dissimilar to K.S.A. 21-3608 to provide any useful persuasive authority.

A few statutes which employ language that roughly tracks the language of K.S.A. 21-3608 include: Colo. Rev. Stat. § 18-6-401(1) (1998) ("A person commits child abuse if such person causes an injury to a child's life or health, or permits a child to be unreasonably placed in a situation which poses a threat of injury to the child's life or health."); Conn. Gen. Stat. § 53-21 (1999) ("Any person who [1] wilfully or unlawfully causes or permits any child under the age

of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or . . . shall be guilty of a class C felony."); Ill. Comp. Stat. ch. 720/5/12-21.6(a) (1998) ("It is unlawful for any person to willfully cause or permit the life or health of a child under the age of 18 to be endangered or to willfully cause or permit a child to be placed in circumstances that endanger the child's life or health."); and N.M. Stat. Ann. § 30-6-1(C) (Michie 1998 Supp.) ("Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be: [1] placed in a situation that may endanger the child's life or health.").

The cases arising under these statutes, however, invariably involve someone either actively causing harm to a child and/or someone in a parental, parent-like, or custodial role permitting harm to befall a child. *See e.g., People v. Hoehl*, 193 Colo. 557, 568 P.2d 484 (1977) (babysitter intentionally pressing child's hands against radiator); *People v. Arevalo*, 725 P.2d 41, 48-49 (Colo. App. 1986) (where boyfriend living with mother of child physically abused child resulting in his death but claimed he had no duty of care to the child; appellate court held that "[e]very person has a duty to refrain from any action which causes a child to be placed in a situation which endangers the child's life or health. The statute refers to no external source of duty, . . . . The law is intended to prevent child abuse, and it applies to any person"). *Cf. State v. Miranda*, 245 Conn. 209, 715 A.2d 680 (1998) (In a case of conviction for assault, court considers numerous cases from other states and discusses at length the reasons why a nonparent who establishes a familial relationship with a woman and her child and who voluntarily assumes responsibility for the care and custody of a child assumes a legal duty to protect the child from abuse.). We have not attempted to exhaust all the decisions from other states, but our limited readings do not show convictions for mere inaction on one who is not a parent, not acting in a parental role, or one who is not a caregiver.

In exhausting the Wilsons' arguments we also recognize they cited several cases from other jurisdictions interpreting the word

"permit" in circumstances totally unrelated to the child endangerment context. Representative of the cases relied upon are *Perkins v. State*, 80 Tex. Crim. 416, 190 S.W. 168 (1916) and *People v. Forbath*, 5 Cal. App. 2d Supp. 767, 2 Cal. Supp. 144, 42 P.2d 108 (1935). Each is claimed to support the contention that, in order to "permit," one must have the right and power to prevent.

Both cases are of limited assistance. *Perkins* is a case where criminal liability was not expanded where one did not have the right and power to prevent or control laborers and the amount of hours worked. *Forbath* held that the words "to permit" in the criminal context necessarily "imply knowledge of, coupled with a duty and power to prevent, the particular act or omission, the allowance, permittance or sufferance of which, constitutes the offense." 5 Cal. App. 2d Supp. at 769.

The State counters that these cases should be ignored as not interpreting the statute in issue, and it argues that our duty is to recognize the purpose of K.S.A. 21-3608 is to protect the lives and health of children who are at risk of being injured. It is claimed that the legislative policy is to create criminal liability whenever any person intentionally and unreasonably fails to take action to prevent endangerment of a child's life of health.

This court does not question that the goal of K.S.A. 21-3608 is to protect children from abuse and neglect, but this does not mean we should expand criminal liability to every circumstance which would arguably protect children despite the statute's express or implied limitations or the factual situations which the legislature expressly declined to reach when it had the opportunity of doing so. If we carry the State's requested interpretation of the statute in this case to its logical extension, anyone without any authority, custody, or control over a child or its abuser is criminally liable for failing to attempt to stop or report known abuse.

It is our duty to construe criminal statutes strictly in favor of those charged under it, and any reasonable doubt about its meaning is to be decided in favor of anyone subjected to its provisions. *Lewis*, 263 Kan. 843, Syl. ¶ 3, 953 P.2d 1016 (1998). We hold that under K.S.A. 21-3608, in order to be found guilty of child endangerment, one must either (1) cause a child under the age of 18

years to be placed in a situation where the child's life, body, or health may be injured or endangered, or (2) have authority or control over either the child or the abuser and permit a child under the age of 18 years to be placed in such a situation where the child's life, body, or health may be injured or endangered.

In arriving at this holding, we are not unsympathetic to the plight of children like L.O., nor do we condone the inaction of the Wilsons. While we conclude in this opinion that some of Gloria's conduct was criminal, the Wilsons' actions prior to the SRS visit, though morally reprehensible, were not criminal as K.S.A. 21-3608 is now written. Courts must interpret the law as written rather than deciding what the law ought to be.

*Was there sufficient evidence that Steven or Gloria Wilson violated K.S.A. 21-3608?*

The Wilsons each challenge the sufficiency of the evidence supporting their convictions. "If the sufficiency of evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Claiborne*, 262 Kan. 416, Syl. ¶ 5, 940 P.2d 27 (1997). Where a trial court has made findings of fact, it is the function of an appellate court to determine whether the findings are supported by substantial competent evidence. *State v. Haskins*, 262 Kan. 728, 731, 942 P.2d 16 (1997).

Based on our interpretation of K.S.A. 21-3608, the Wilsons' failure to act was not in itself sufficient to create criminal liability because they had neither authority nor control over either L.O. or her abuser, *i.e*, they were not in a position to "permit" L.O.'s placement in the abusive situation. Accordingly, Steven's conviction must be reversed.

However, there was evidence that when SRS first came to investigate L.O.'s circumstances, Gloria was a leader among those who falsely asserted that L.O. was not in the house and, in fact, had gone to California. The trial court made specific findings of fact to this effect. This action by Gloria had the effect of "causing" a situation where the abuse could be continued.

SRS had to secure a search warrant. This resulted in L.O. remaining in an abusive situation for an additional day. Gloria's conduct was an act of commission, not a mere omission. Her interference with the earliest intervention by SRS places her in a different position than Steven. When Gloria stepped into the active role of hiding the abuse and effectively turning away the only help L.O. was going to receive, she participated in creating, sustaining, and causing the endangering circumstances of the child. Accordingly, Gloria's conviction is affirmed.

Affirmed in part and reversed in part.