(13 P.3d 29)

No. 84,186

State of Kansas, *Appellee*, v. Michael B. Sharp, *Appellant*.

Opinion filed November 3, 2000.

*B. Kay Huff*, of Lawrence, for appellant.

*Angela M. Wilson* and *Trent M. Krug*, assistant district attorneys, *Christine K. Tonkovich*, district attorney, and *Carla J. Stovall*, attorney general, for appellee.

Before Gernon, P.J., Marquardt, J., and Robert J. Schmisseur, District Judge, assigned.

Schmisseur, J.: Michael B. Sharp appeals his conviction by a jury of endangering a child. We reverse and remand for a new trial.

On June 13, 1999, at about 3:30 a.m., Sharp returned to an apartment he shared with his girlfriend, Kristin Lockwood, after a night of shooting pool. Sharp woke the couple's 3-week-old daughter and began holding her. Lockwood was upset with Sharp, and a verbal argument ensued, which eventually proceeded outside the apartment, with Sharp still holding the baby. Lockwood testified there was a possibility Sharp was under the influence of alcohol or drugs because it was late. She also testified she did not think the baby was in any danger with Sharp.

Lockwood told Sharp she was going to call the police if he left with the baby. After arguing for about an hour, Lockwood locked Sharp out of the apartment. Sharp left on foot with his daughter, and Lockwood called the police. The weather that evening was described as mild, and the baby was wearing a Onesie and was wrapped in a blanket the entire time.

Officer Thomas contacted Lockwood at the couple's apartment. Lockwood advised Thomas she thought Sharp "was under the influence of amphetamine or something similar to that." Thomas then apprised the officers in contact with Sharp of this information.

Officer Bordman, while en route, was advised by dispatch that Sharp had an active warrant for his arrest. When Bordman arrived at the scene, about 1 block from Sharp's apartment, Officers Godden and Garcia were already engaged in conversation with Sharp. Garcia asked to hold the baby, and Sharp refused. Sharp indicated he wanted to leave the area and walk back to his apartment with the baby. The officers surrounded him and refused to let him leave. Bordman testified the officers wanted Sharp to give them the baby because Sharp had a warrant out for his arrest. At that time, the officers had not advised Sharp he was under arrest.

Bordman testified that Sharp appeared agitated by the way he was holding the baby, from the manner in which he was talking, and from the fact he had just left a domestic disturbance. According to Bordman, there was no safe way the officers could have approached Sharp without endangering the baby. The officers were concerned for the welfare of the baby and could not predict Sharp's next action. Bordman also testified that Sharp never threatened to harm the baby and, in fact, did appear concerned for the child.

Sharp eventually agreed to hand over the baby in return for some cigarettes. An officer retrieved a pack of cigarettes from a nearby store. Bordman gave Sharp a cigarette and let him smoke it while still holding the baby. While Sharp was smoking the cigarette, another officer told Sharp that there was a warrant for his arrest and he was going to jail. Sharp finished smoking the cigarette and then handed the baby to the police. Approximately 14 minutes elapsed

from the time the police first requested that Sharp release the baby to the time Sharp was placed in custody.

After Sharp was in custody, Lockwood walked down the street to retrieve the baby, who was released to her unharmed. En route to jail, Sharp informed Bordman he knew about the warrant but wanted a cigarette before being arrested. Following a trial by jury, Sharp was convicted of endangering a child.

Although our opinion focuses on the jury instructions, we will first review the sufficiency of the evidence argument, as the child endangerment law is extremely fact sensitive.

Sharp asserts there was insufficient evidence to convict him of endangering a child. The standard of review for challenging the sufficiency of evidence in a criminal case is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Wilson*, 267 Kan. 550, 568, 987 P.2d 1060 (1999).

"Endangering a child is intentionally and unreasonably causing or permitting a child under the age of 18 years to be placed in a situation in which the child's life, body or health may be injured or endangered." K.S.A. 21-3608(a). Sharp argues his actions and conduct did not endanger his child and did not violate the statute. The State argues that based on testimony of Sharp's possible intoxication, his defiant acts throughout police negotiations, and his reluctance to release the baby until a cigarette was provided, the jury was within its province to find Sharp guilty of endangering a child.

In *State v. Fisher*, 230 Kan. 192, 631 P.2d 239 (1981), the Kansas Supreme Court interpreted the language and purpose of K.S.A. 21-3608(a) (which was at that time found in K.S.A. 21-3608[1][b] [Ensley 1981]) and concluded it was not unconstitutionally vague. 230 Kan. at 199-200. The court held the purpose of the statute is salutary, to protect children and to prevent their being placed where it is reasonably certain injury will result. 230 Kan. at 199. Although the wording of the statute is broad, the purpose is likewise broad: "to prevent people from placing children in situations where their lives and bodies are obviously in imminent peril . . . .

it is the likelihood of injury against which the statute speaks." 230 Kan. at 199-200. After reviewing how other states have construed similar statutes, the court held the word "may," as used in the Kansas statute, "means something more than a faint or remote possibility; it means that there is a reasonable probability, a likelihood that harm to the child will result." 230 Kan. at 195. The court concluded the statute conveys a sufficiently definite warning when measured by common understanding, and it was not void for vagueness. 230 Kan. at 200.

More recently, in *Wilson*, the Kansas Supreme Court upheld its earlier ruling in *Fisher*, declaring once again that K.S.A. 21-3608(a) is not void for vagueness. 267 Kan. at 556. The *Wilson* court also addressed the sufficiency of evidence needed in a conviction for child endangerment. See 267 Kan. at 568. In *Wilson*, the court ruled failure to act was not in itself sufficient to create criminal liability because the defendant had neither control nor authority over the child or her abuser, *i.e.*, the defendant was not in a position to "permit" the child's placement in the abusive situation. 267 Kan. at 568. Although *Wilson* involved a dissimilar factual scenario, the court's rulings offer guidance in the present case.

The *Wilson* court stated that the goal of the child endangerment statute is to protect children from abuse and neglect, but it declined to "expand criminal liability to every circumstance which would arguably protect children despite the statute's express or implied limitations or the factual situations which the legislature expressly declined to reach when it had the opportunity of doing so." 267 Kan. at 567 (ruling the statute does not create criminal liability in persons for failing to attempt to stop or report known abuse, if such persons have no authority or control over the child or abuser). The court also held:

"[I]n order to be found guilty of child endangerment, one must either (1) cause a child under the age of 18 years to be placed in a situation where the child's life, body, or health may be injured or endangered, or (2) have authority or control over either the child or the abuser and permit a child under the age of 18 years to be placed in such a situation where the child's life, body, or health may be injured or endangered." 267 Kan. at 567-68.

Here, Sharp obviously had control over the child and caused the child to be in this certain situation. Thus, the determinative ques-

tion is whether the situation was one in which the child's life, body, or health might have been injured or endangered. This question cannot be addressed without first articulating what specific act or situation the State was claiming violated the statute. In its closing argument, the State claimed the crime started when the police stopped Sharp to check on the welfare of the child and to execute the outstanding warrant. It argued Sharp used his 3-week-old baby as a shield from the police to buy himself time and ultimately buy himself a cigarette.

As discussed earlier, the word "may" has been judicially defined to mean more than a faint or remote possibility; it means there is a reasonable probability, a likelihood that harm to the child will result. *Fisher*, 230 Kan. at 195. The real issue then becomes whether, after Sharp was stopped by the police, the child was ever in a situation in which there was a reasonable probability or likelihood she would be harmed.

Sharp was stopped by the police and asked to hand his baby over to them. He initially refused. Sharp then asked to walk the baby home. The officers denied his request. At that time, the police had not informed Sharp he was under arrest. The State claims that Sharp was defiant and the police were afraid of a flight situation and were concerned for the infant's welfare. Yet it fails to show how the baby was ever in any danger. Sharp did not actively resist or ever place the baby in any danger. There is no evidence he ever moved or attempted to flee. When the police finally told Sharp he was under arrest for an outstanding warrant, he handed the baby to the police moments later. The fact that Sharp knew he had a warrant out for his arrest is academic.

The only evidence presented which would tend to show there was even a remote possibility the baby could have been injured was testimony claiming Sharp may have been under the influence of alcohol or drugs and testimony that Sharp appeared to be in an agitated state when the police arrived. However, there was little evidence presented to show Sharp was actually under the influence of alcohol or drugs. Further, Lockwood testified she did not believe the baby was in any danger with Sharp. Bordman also testified

Sharp seemed concerned for the infant by the way he was holding her.

The State seemed to concede in its closing argument it had no legal reason to stop Sharp and demand he turn over the baby had there not been a warrant for his arrest. Once the police finally told Sharp he was under arrest, Sharp gave his child to the police moments later. There is no evidence the child was actually ever in danger. Further, the purpose of the statute, as illustrated by prior case law, is to protect children from abuse and neglect and to prevent them from being placed in situations where their lives and bodies are obviously in imminent peril. *Wilson*, 267 Kan. at 567; *Fisher*, 230 Kan. at 199-200. There must be a reasonable probability, a likelihood, that harm to the child will result. 230 Kan. at 195.

The standard of review on an insufficiency of the evidence argument is difficult for an appellant to satisfy. Giving appropriate deference to the jury and the trial court, we struggle on the sufficiency issue. Since we reverse on the issue of the jury instructions, we decline to determine as a matter of law that the evidence was insufficient to support a conviction.

The controlling issue is whether the jury instruction defining the elements of endangering a child was clearly erroneous. We determine that it was.

Sharp argues the jury instruction containing the elements of endangering a child did not properly and fairly state the law as applied to the facts of this case, and the instruction was constitutionally defective. Sharp acknowledges the trial court gave the standard PIK instruction, PIK Crim. 3d 58.10, without objection. The PIK Committee has substituted the word "might" for the word "may" used in the statute. When a defendant did not object to a jury instruction, the defendant, on appeal, must show the instruction was clearly erroneous. An instruction is clearly erroneous if the reviewing court is convinced there is a real possibility the jury would have rendered a different verdict had the error not occurred. *State v. Henry*, 263 Kan. 118, 131, 947 P.2d 1020 (1997).

The Kansas Supreme Court has advised trial courts that PIK language is preferable, and absent particular facts requiring mod-

ification, the PIK language should be followed. *State v. Moncla*, 262 Kan. 58, 71, 936 P.2d 727 (1997). However, if the particular facts in a given case require modification or additions to the relevant instruction, the court should not hesitate to make such changes. 262 Kan. at 71.

Here, the jury instruction at issue follows the language of the statute. It reads, in pertinent part: "That the defendant intentionally and unreasonably caused or permitted Zoe Sharp to be placed in a situation in which Zoe Sharp's life, body, or health might be injured or endangered." Sharp asserts it was clear error for the court not to define the term "might" as used in the instruction.

The *Fisher* court noted the word "may," in ordinary usage, means permissive or connotes a possibility, however remote, of occurring. 230 Kan. at 194. In *Fisher*, the court discussed and adopted the rationale of the Colorado Supreme Court in defining the word "may" as used in the child endangerment statute. 230 Kan. at 194-95. The Colorado Supreme Court, in *People v. Hoehl*, 193 Colo. 557, 560, 568 P.2d 484 (1977), stated "may" normally means in some degree likely, expressing permission, possibility, probability, or contingency. The Colorado court concluded: "So construed, we seriously doubt whether 'may' in a criminal statute provides a fair description of the prohibited conduct, since virtually any conduct directed toward a child has the possibility, however slim, of endangering the child's life or health." 193 Colo. at 560. In *Fisher*, the Kansas Supreme Court agreed with this rationale and held the word "may" as used in the child endangerment statute, "means something more than a faint or remote possibility; it means that there is a reasonable probability, a likelihood that harm to the child will result." 230 Kan. at 195.

Although the *Fisher* court goes on to conclude the statute "is clear and understandable; that ordinary persons can determine what conduct is proscribed by a common-sense reading of the statute," its earlier discussion on the different meanings of the word "may" iterates why it is important that that particular word be defined in the context of this statute. 230 Kan. at 195, 200. Simply saying a child "might" be injured, in its ordinary meaning, is not sufficient to convict someone of endangering a child. See 230 Kan.

at 195 (adopting the rationale of the Colorado court that concluded the word "may" does not provide a sufficient description of the prohibited conduct). The logical conclusion of this analysis means the term "might," as used in the jury instruction, must be judicially defined in the same manner.

The jury instruction given in this case does not reflect the proper legal standard to consider in determining whether a crime has been committed. The ordinary or normal meaning of the word "may" was specifically rejected by the *Fisher* court in favor of a definition containing a legal standard: reasonable probability. 230 Kan. at 195. There is a very real possibility, especially under the facts of this case, that the jury would have returned a different verdict had the term "might" been properly defined as more than a faint or remote possibility, a reasonable probability, a likelihood that harm to the child will result or that the child will be placed in imminent peril. See Comment to PIK Crim. 3d 58.10.

Reversed and remanded for a new trial.