No. 87,790

STATE OF KANSAS, *Appellee,* v. SONJI DANIELS, *Appellant.*
(91 P.3d 1147)

Opinion filed June 25, 2004.

*Sandra M. Carr*, assistant appellate defender, argued the cause and was on the briefs for appellant.

*Bradley R. Burke*, assistant district attorney, argued the cause, and *Scott E. McPherson*, assistant district attorney, and *Christine Kenney*, district attorney, and *Phill Kline*, attorney general, were with him on the brief for appellee.

The opinion was delivered by

LUCKERT, J.: A jury convicted Sonji Daniels of aiding and abetting aggravated robbery, conspiracy to commit aggravated robbery, and endangering a child. In an unpublished opinion, the Court of

Appeals affirmed her convictions. *State v. Daniels*, No. 87,790, unpublished opinion filed October 3, 2003. This court granted her petition for review.

Daniels raises six issues: (1) Did Daniels' sentences violate her right to trial by jury and to due process of law where the jury instructions defining aggravated robbery omitted the element of bodily harm?; (2) Where the jury instructions defining aggravated robbery omitted the element of bodily harm and failed to define bodily harm, were the instructions clearly erroneous?; (3) Was Daniels' right to a fair trial violated by the admission of involuntary statements coerced by police from her 12-year-old son?; (4) Did the district court err in denying Daniels' motion for mistrial based upon the misconduct of a prosecution witness?; (5) Were Daniels' convictions of aiding and abetting aggravated robbery and conspiracy to commit aggravated robbery supported by sufficient evidence?; and (6) Was Daniels' conviction of endangering a child supported by sufficient evidence?

*Facts*

Daniels accepts the Court of Appeals' rendition of the facts. Those facts are set out below:

"On April 4, 2001, the victim walked the few blocks from his home to the Capitol Federal Savings Bank as he had done frequently in the past. Arriving at the bank, the victim deposited a portion of his paycheck and withdrew $293 in cash, which he placed in the left front pocket of his pants. Directly behind the victim in line at the bank, the defendant waited to withdraw some money from her account.

"After leaving the bank, the victim, who was 78 years old and moved very slowly, turned down the alley connecting 10th and 11th Streets between Vermont and Massachusetts and headed for the post office. Before the victim reached 10th Street, two young African-American males entered the alley from 10th Street, approached the victim, and punched the victim in the chest, knocking him down and causing him to hit his head on a drain pipe. The two men then pinned the victim to the ground while one of them reached into the victim's front left pocket and pulled out the cash the victim had just withdrawn from the bank. Afterwards, the African-American males ran towards 10th Street.

"The victim picked himself up and walked over to a doorway where Salwa Iskandrani witnessed the attack on the victim. She and her son Mohammed helped the victim into the restaurant owned by Mohammed and provided the victim with a wet towel to wipe the blood flow from a cut in the victim's head. The victim

remained in the restaurant until the police arrived. Ms. Iskandrani later identified the attackers as African-American males who were both dressed in red-colored shirts and long sweat pants. The victim provided a similar description.

"About 3:30 p.m., Diana Kitsmiller exited her place of employment at the corner of 10th Street and Massachusetts to put money in a parking meter. Kitsmiller had parked next to the alley across from D & D Tire Shop. As Kitsmiller was putting money in the meter, she was startled as two African-American men nearly bumped into her as they ran out of the alley onto 10th Street.

"Kitsmiller continued to watch the men until she lost sight of them shortly after they crossed Massachusetts Street. Kitsmiller then investigated the alley with a fellow employee and discovered that the victim had been robbed. She provided a statement to the investigating officers.

"As Officer Craig Shanks ended his shift and left the law enforcement center at approximately 3:20 p.m., on April 4, 2001, he noticed a blue, 4-door Chevrolet bearing an Illinois license tag, which the officer associated with Dewayne Moss due to a prior traffic stop of the vehicle. The vehicle was parked in the 1000 block of New Hampshire Street on the west side of the street, facing south, but, approximately 2 hours earlier that day, Officer Shanks had seen the same vehicle parked on the east side of the 1100 block of Rhode Island, facing north.

"As he observed the vehicle, he saw Moss and another man running across New Hampshire Street. The officer identified Moss from a distinctive scar running down the left side of his neck. While the officer did not recognize the other person, he noted that both men wore similar clothing. Later, hearing reports of the robbery over the police radio, Officer Shanks informed dispatch of his observations.

"When dispatch broadcast Officer Shanks' report, Officer Leo Souders traveled down Rhode Island Street from 9th Street and observed a dark blue Chevrolet Malibu with an Illinois license. Noting that the tags had expired in March of 1999, Officer Souders made a traffic stop of the vehicle and approached the driver, who was an African-American woman. The vehicle contained only one passenger, an African-American juvenile male.

"Officer Souders identified the driver of the vehicle as the defendant. He requested permission to search the vehicle and the defendant's purse, and the defendant consented. After the officer had completed his search, the defendant requested permission to leave to pick up her children from school.

"Officer Souders and Officer Verbanic followed the defendant to her apartment and requested permission to search the premises. The defendant again consented, but the search provided no evidence of the robbery.

"In the course of investigating the robbery, the police identified and interviewed an employee of D & D Tire Shop, who had witnessed two African-American males emerging from a blue Chevy Malibu and entering the alley at approximately 3:30 p.m. on April 4, 2001. The witness stated that one of the men was approximately 6 feet and wore jeans and a red and white shirt; the other was approximately 5 inches shorter than the first and wore cut-off jean shorts and a dark shirt.

"Because D.D., the son of the defendant, was in the car when the defendant was stopped on April 4th for having expired license tags, the police decided to interview him as a possible witness to the robbery. Detective Lance Flachsbarth and Officer Ryan Sayler first questioned D.D. in the principal's office at D.D.'s school on April 13, 2001. During this interview, D.D. asserted that only his mother and he had been in the vehicle on April 4th and that they had not transported Moss anywhere.

"According to Detective Flachsbarth, however, D.D.'s statements became fraught with contradictions after the detective began exploring D.D.'s initial responses. Consequently, the detective decided to conduct a second interview that same day after picking up D.D. and two of his siblings at the Boys and Girls Club.

"At the second interview, D.D. stated that in the early afternoon of April 4th, his mother and he had visited the law enforcement center. According to D.D., after completing their business, the defendant and D.D. were met by Moss and D.D.'s older brother, Dante. The defendant, the 2 children, and Moss all rode in the car to the bank. D.D. told the detective that his mother, the defendant, then entered the bank. When the defendant returned, she spoke to Moss and Dante outside the car. The defendant then drove around the corner, and Moss and Dante exited the vehicle and walked down the alley.

"After the interview, Detective Flachsbarth requested D.D. to show the police the route that the defendant took from the bank to the place where Moss and Dante exited the vehicle in front of the D & D Tire Shop." Slip op. at 2-7. *State v. Daniels*, No. 87,790, unpublished opinion filed October 3, 2003.

A jury convicted Daniels of aiding and abetting aggravated robbery, conspiracy to commit aggravated robbery, and endangering a child. Daniels received a controlling sentence of 66 months' imprisonment.

*Where the Jury Instructions Defining Aggravated Robbery Omitted the Element of Bodily Harm and Failed to Define Bodily Harm, Were the Instructions Clearly Erroneous?*

Daniels' first and second arguments are based upon the trial court's failure to properly instruct the jury on the elements of the underlying crime of aggravated robbery. The jury instruction omitted the element of bodily harm which distinguishes a simple robbery from an aggravated robbery. Robbery is defined as "the taking of property from the person or presence of another by force or by threat of bodily harm to any person." K.S.A. 21-3426. Aggravated robbery is defined as a robbery "committed by a person who is

armed with a dangerous weapon or who inflicts bodily harm upon any person in the course of such robbery." K.S.A. 21-3427.

Neither party objected to the jury instruction as given. It appears that the omission of the bodily harm element was inadvertent as the State argued in closing that the abrasion to the back of the victim's head constituted the bodily harm element of aggravated robbery.

On appeal, Daniels argues that the omission of the bodily harm element violated her right to jury trial and due process and that, because of the omission, the jury instructions were clearly erroneous. Considering the issues in the reverse order submitted by the parties, we first discuss whether the omission of the bodily harm element render the jury instructions clearly erroneous. This issue, which incorporates the clearly erroneous standard, states our standard of review since Daniels did not object to the instructions as given and did not request that the instructions define bodily harm. K.S.A. 2003 Supp. 22-3414(3). "Instructions are clearly erroneous only if the reviewing court is firmly convinced there is a real possibility that the jury would have rendered a different verdict if the error had not occurred. [Citations omitted.]" *State v. Davis*, 275 Kan. 107, 115, 61 P.3d 701 (2003).

The Court of Appeals applied *State v. Bryant*, 22 Kan. App. 2d 732, 734-35, 922 P.2d 1118, *rev. denied* 260 Kan. 996 (1996), which held that the definition of bodily harm used in aggravated kidnapping cases is also applicable to aggravated robbery cases. In the context of aggravated kidnapping, bodily harm includes any act of physical violence even though no permanent injury results. Trivial or insignificant bruises or impressions resulting from the act itself are not considered to be bodily harm, but unnecessary acts of violence, including those occurring after the initial abduction of the victim, do constitute bodily harm. *Bryant*, 22 Kan. App. 2d at 734-35 (citing *State v. Sanders*, 225 Kan. 156, 587 P.2d 906 [1978]).

Based upon the above definition, the Court of Appeals in this case concluded that the jury could have found that the victim's head injury, which occurred when the robbers intentionally struck the victim, causing him to fall and hit his head on a drain pipe, constituted bodily harm. The court also found that the force used

was excessive in light of what was necessary to accomplish the robbery. Slip op. at 10-11.

In support of its conclusion, the Court of Appeals cited *State v. Redford*, 242 Kan. 658, 671, 750 P.2d 1013 (1988). Slip op. at 11. The jury instructions in *Redford* defined rape as nonconsensual sexual intercourse but omitted the element that the victim was overcome by force or fear. The *Redford* court noted there was no evidence of nonconsensual intercourse in any circumstance other than fear, and that Redford's defense was to present a completely different version of events and to deny nonconsensual intercourse. In essence, the jury could choose to believe either the victim or Redford. Under these facts, the *Redford* court found the erroneous jury instruction to be harmless because the jury's verdict would have been no different had the jury been properly instructed. 242 Kan. at 671-72.

In her brief, Daniels essentially argues that a jury instruction which omits an essential element of the crime must always be clearly erroneous. That is clearly not the case. In addition to *Redford*, the following cases have found the omission of an element of the crime in a jury instruction to be harmless error: *State v. Duke*, 256 Kan. 703, 712-14, 887 P.2d 110 (1994) (omission of element of aggravated arson that fire damaged property in which another person has an interest was harmless error because "missing element in the instruction would not have altered the outcome of the trial"); and *State v. Peltier*, 249 Kan. 415, 423-28, 819 P.2d 628 (1991), *cert. denied* 505 U.S. 1207 (1992) (error in instructing the jury that, as a matter of law, indecent liberties with a child constituted the bodily harm necessary to establish element of aggravated kidnapping was harmless beyond a reasonable doubt).

In addition, the United States Supreme Court has also ruled that the failure to submit an element of the crime to the jury was not structural error and was, therefore, subject to harmless error review. *Neder v. United States*, 527 U.S. 1, 144 L. Ed. 2d 35, 119 S. Ct. 1827 (1999).

Neder was convicted of filing false federal income tax returns, mail fraud, wire fraud, and bank fraud. The trial court determined that materiality was not a question for the jury and found that the

evidence established the element of materiality with regard to the tax and bank fraud charges. The court also omitted the element of materiality from the instructions on mail fraud and wire fraud. The Eleventh Circuit affirmed, holding that the trial court erred in failing to submit the materiality element of the tax offense to the jury under *United States v. Gaudin*, 515 U.S. 506, 132 L. Ed. 2d 444, 115 S. Ct. 2310 (1995), but that the error was harmless. The Eleventh Circuit also ruled that the trial court did not err in failing to submit materiality to the jury on the remaining charges because materiality was not an element of mail fraud, wire fraud, or bank fraud.

The United States Supreme Court affirmed the first portion of the Eleventh Circuit's ruling. Citing *Gaudin*, the Court concluded that refusing to instruct on the element of materiality on the fraud charges was erroneous. 527 U.S. at 4.

This court recently relied upon *Gaudin* in holding that a trial court erred in instructing the jury that, as a matter of law, an element of the crime had been established by the evidence. *State v. Brice*, 276 Kan. 758, 80 P.3d 1113 (2003). The *Brice* court described the *Gaudin* decision as follows:

"*Gaudin*, 515 U.S. 507, is a unanimous decision of the United States Supreme Court, holding that it was unconstitutional for the trial judge to refuse to submit to the jury the question of materiality of defendant's statements in a prosecution for making false statements on Federal Housing Administration (FHA)/Department of Housing and Urban Development (HUD) loan documents. Gaudin was charged with knowingly inflating the appraised value of the mortgaged property and misrepresenting which party was to pay closing costs. The government called several FHA/HUD program administrators as witnesses to explain why the information Gaudin allegedly falsified was important. The trial judge instructed the jury that one of the elements the government was required to prove in order to convict Gaudin was that the alleged false statements were material to the activities and decisions of HUD. 'But, the court further instructed, "[t]he issue of materiality . . . is not submitted to you for your decision but rather is a matter for the decision of the court. You are instructed that the statements charged in the indictment are material statements." ' 515 U.S. at 508.

"The Ninth Circuit Court of Appeals reversed Gaudin's convictions, holding that 'taking the question of materiality from the jury denied respondent a right guaranteed by' the Due Process Clause of the Fifth Amendment and the Sixth Amendment right of criminal defendants to a trial by an impartial jury. 515 U.S. at 509. On certiorari, the government argued that the principle of requiring the

jury to decide all the elements of a criminal offense was inapplicable because the question of materiality was a question of law. The Supreme Court rejected the argument on the grounds that materiality is a mixed question of law and fact and that mixed questions historically have been determined by juries in reaching criminal verdicts. 515 U.S. at 512-15. The Supreme Court stated:

> 'The Fifth Amendment to the United States Constitution guarantees that no one will be deprived of liberty without "due process of law"; and the Sixth, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." We have held that these provisions require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt. *Sullivan v. Louisiana*, 508 U.S. 275, 277-278[, 124 L. Ed. 2d 182, 113 S. Ct. 2078] (1993).' 515 U.S. at 509-10.

In affirming the judgment of the Ninth Circuit Court of Appeals, the Supreme Court concluded: 'The Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged. The trial judge's refusal to allow the jury to pass on the "materiality" of Gaudin's false statements infringed that right.' 515 U.S. at 522-23." *Brice*, 276 Kan. at 766-67.

In *Brice*, the defendant was convicted of aggravated battery based upon his shooting the victim in the leg. The trial court instructed the jury that "great bodily harm" as an element of aggravated battery means a "through and through bullet wound." The *Brice* court held that the instruction "invades the province of the jury as factfinder and violated Brice's Fifth and Sixth Amendment rights to have the jury determine his guilt or innocence." 276 Kan. at 772. The *Brice* court reversed and remanded for a new trial without engaging in a harmless error analysis.

Nor did the *Gaudin* court analyze whether the error in that case could be harmless. As noted by Chief Justice Rehnquist in his concurring opinion, the government had not argued that the error was harmless or "not plain," 515 U.S. at 526, thus the Court had "no occasion to review the Court of Appeals' conclusion that the constitutional error here 'cannot be harmless.' [Citation omitted.]"

However, in *Neder*, immediately after noting that *Gaudin* established that it was error not to include the element of materiality in the instructions relating to the fraud charges, the Court stated: "We hold that the harmless-error analysis of *Chapman v. California*, 386 U.S. 18, [17 L. Ed. 2d 705, 87 S. Ct. 824] (1967), applies to

this error." *Neder*, 527 U.S. at 4. The Court considered whether a jury instruction that omits an element of the offense falls within that category of fundamental constitutional errors which are so intrinsically harmful as to require automatic reversal. The Court noted that it had found structural error requiring automatic reversal in only a few limited cases such as cases involving the complete denial of counsel, a biased trial judge, racial discrimination in grand jury selection, denial of self-representation at trial, denial of a public trial, and a defective reasonable doubt instruction. 527 U.S. at 8.

The *Neder* Court found that an erroneous jury instruction which omits an element of the offense "differs markedly" from the types of constitutional violations listed above. 527 U.S. at 8. Whereas structural errors render a trial fundamentally unfair, "an instruction that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." 527 U.S. at 9. In support, the Court cited *Johnson v. United States*, 520 U.S. 461, 137 L. Ed. 2d 718, 117 S. Ct. 1544 (1997), a perjury case where the element of the materiality of the false statement was decided by the trial judge rather than the jury. Because Johnson failed to object at trial, the Court had reviewed her claim under the "plain error" standard, finding that the error did not require reversal based upon the overwhelming and "essentially uncontroverted" evidence supporting materiality. 520 U.S. at 470.

According to the *Neder* Court, its opinion in *Johnson* cut "against the argument that the omission of an element will *always* render a trial unfair." 527 U.S. at 9. The Court noted that improperly omitting an element of the offense is analogous to improperly instructing a jury on an element and improperly instructing the jury that an element is conclusively presumed because all three types of errors preclude the jury from making a finding on the actual element of the offense.

In deciding that the erroneous omission of an element from a jury instruction was subject to a harmless error analysis, the Court rejected the more restrictive approach suggested by Neder that such errors be deemed harmless only in certain rare circumstances.

Instead, the Court applied the constitutional harmless error test set out in *Chapman*. 527 U.S. at 15.

The Court found that the error was harmless because the evidence supporting materiality was so overwhelming that Neder had never argued that his false statements about his income were immaterial. The Court stated:

"In this situation, where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless. We think it beyond cavil here that the error 'did not contribute to the verdict obtained.'" 527 U.S. at 17 (quoting *Chapman*).

With regard to the reviewing court's inquiry, the Court explained that a reviewing court "asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element. If the answer to that question is 'no,' holding the error harmless does not 'reflec[t] a denigration of the constitutional rights involved.' [Citation omitted.]" 527 U.S. at 19.

As to the second portion of the Eleventh Circuit's ruling, the *Neder* Court ruled that materiality was an element of mail fraud, bank fraud, and wire fraud and remanded the case to the Eleventh Circuit for a determination of whether the trial court's failure to instruct on the element of materiality as to these offenses was harmless error. 527 U.S. at 25.

Thus, we must determine if the omission of the element of bodily harm was harmless error or not. Under the *Neder* test, "where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." 527 U.S. at 17. Stated another way, the reviewing court "asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." 527 U.S. at 19. If the answer to that question is "no," the error may be held harmless.

Under the facts of this case, the element of bodily harm was not contested and was supported by overwhelming evidence. The ev-

idence established that the robbers hit the victim in the chest, causing him to fall and cut his head on a drain pipe. The record on appeal includes a photograph showing the victim's injury. Although there was little evidence regarding the injury, there was testimony about the flow of blood and the assistance provided by bystanders to stop the bleeding. Furthermore, we agree with the State and with the Court of Appeals that it was unnecessarily violent to push a 78-year-old man to the ground in order to accomplish a robbery.

As we stated in *State v. Young*, 277 Kan. 588, 594, 87 P.3d 308, 314 (2004), the omission of the element of bodily harm from the jury instruction on aggravated battery was "literally but not legally 'clearly erroneous.' " We are convinced beyond a reasonable doubt that the jury's verdict would have been the same even if it had been correctly instructed, thus we hold that the error was harmless.

We also reject Daniels' argument that, had the jury been properly instructed as to the definition of bodily harm, it could easily have found that the victim's injury was merely trivial or insignificant. As discussed above, the evidence of bodily harm was essentially uncontested and, as a result, overwhelming. We find that the trial court did not err in failing to instruct the jury on the definition of bodily harm. See *State v. Royal*, 234 Kan. 218, 222, 670 P.2d 1337 (1983).

*Did Daniels' Sentences Violate her Right to*
*Trial by Jury and to Due Process of Law Where the*
*Jury Instructions Defining Aggravated Robbery*
*Omitted the Element of Bodily Harm?*

Daniels also argues that the error requires automatic reversal because the omitted element of bodily harm is what distinguishes severity levels of robbery. See *State v. Crawford*, 247 Kan. 223, 795 P.2d 401 (1990) (jury instruction on aggravated burglary which erroneously omitted the essential element that a human being was inside the house was clearly erroneous because jury could find not more than simple burglary).

Daniels cites *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), for the premise that any fact which

increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt.

As noted by the Court of Appeals, *Apprendi* held that using a judge's factual determination to enhance a defendant's sentence invaded the province of the jury to decide whether a defendant was guilty beyond a reasonable doubt. The Court of Appeals concluded that *Apprendi* did not apply in this case because the trial court did not make any factual determinations which increased Daniels' sentence beyond statutorily authorized limits and did not impose an upward departure sentence. Slip op. at 9. We agree with the Court of Appeals on this point.

This court has discussed *Apprendi* in ruling on the validity of upward durational departure sentences (*State v. Gould,* 271 Kan. 394, 23 P.3d 801 [2001]), upward dispositional departure sentences (*State v. Carr,* 274 Kan. 442, 53 P.3d 843 [2002]), the hard 40 and hard 50 sentencing schemes (*State v. Conley,* 270 Kan. 18, 11 P.3d 1147 [2000]; and *State v. Douglas,* 274 Kan. 96, 49 P.3d 446 [2002]), and the procedure for authorizing adult prosecutions (*State v. Jones,* 273 Kan. 756, 47 P.3d 783 [2002]). However, this court has never applied *Apprendi* in a case involving erroneous jury instructions. Daniels does not cite any authority to support her theory.

Furthermore, an examination of decisions of the United States Supreme Court leads us to conclude that even if an *Apprendi*-type error did occur, Daniels' argument fails because the alleged error was not structural. Thus, reversal is not automatic, and the analysis of *Neder* and *Johnson* still apply.

Since *Apprendi,* the United States Supreme Court has unanimously reiterated "that the trial court's failure to instruct a jury on all of the statutory elements of an offense is subject to harmless-error analysis. *E.g., Neder v. United States,* 527 U.S. 1, 19, [144 L. Ed. 2d 35, 119 S. Ct. 1827] (1999)." *Mitchell v. Esparza,* 540 U.S. ___, 157 L. Ed. 2d 263, 269, 124 S. Ct. 7, 11 (2003). The *Mitchell* Court did not discuss *Apprendi* in relation to this issue.

In *United States v. Cotton,* 535 U.S. 625, 152 L. Ed. 2d 860, 122 S. Ct. 1781 (2002), the Court did find *Apprendi* error in the

omission from a federal indictment of a fact that enhanced the statutory maximum sentence. However, as in *Neder*, the Court relied upon *Johnson* and concluded the error was not structural. 535 U.S. at 632. Consequently, the *Cotton* Court applied a plain error analysis, one aspect of which requires determination of whether the error "affects substantial rights" which usually means that the error " 'must have affected the outcome of the district court proceedings.' " 535 U.S. at 632 (quoting *United States v. Olano*, 507 U.S. 725, 734, 123 L. Ed. 2d 508, 113 S. Ct. 1770 [1993]). The *Cotton* Court compared the failure to include an element in the indictment to the situation in *Johnson* in which the district court failed to submit an element of the false statement offense, materiality, to the petit jury. The *Johnson* court noted that the evidence of materiality was "overwhelming" and "essentially uncontroverted." 520 U.S. at 470. The *Cotton* court applied the same test and determined that the evidence regarding the omitted element of the indictment, the quantity of drugs, was "overwhelming" and "essentially uncontroverted" and concluded that "[s]urely the grand jury" would have found the quantity of drugs sufficient to meet the enhancement criteria. 535 U.S. at 633.

Thus, even if there was *Apprendi*-type error, which we decline to decide, our analysis would still be that the evidence of bodily harm was essentially uncontroverted. Accordingly, we reject Daniels' arguments that the omission of the bodily harm element requires reversal.

*Was Daniels' Right to a Fair Trial Violated*
*By the Admission of Involuntary Statements*
*Coerced by Police from her 12-year-old son?*

Next, Daniels argues that her right to a fair trial was violated by the trial court's admission of involuntary statements coerced by police from her 12-year-old son, D.D. Daniels did not object to the admission of D.D.'s statements at trial.

A criminal defendant is deprived of due process when his or her conviction is based, in whole or in part, upon the coerced statement of a witness. *State v. Shumway*, 30 Kan. App. 2d 836, 840-41, 50 P.3d 89, *rev. denied* 274 Kan. 1117 (2002). To determine whether

a witness' statements are voluntary, the court looks at the totality of the circumstances and considers the same factors used to weigh the voluntariness of a defendant's confession. 30 Kan. App. 2d at 841-42.

A criminal defendant has the right to object to the introduction of any confession or admission on grounds of voluntariness, and when a defendant so objects, the prosecution then has the burden of proving the confession is voluntary and admissible. *State v. Miles*, 233 Kan. 286, 295, 662 P.2d 1227 (1983). However, a trial court has no duty to hold a hearing on the voluntariness of a confession absent some type of objection or motion by the defendant. *State v. Bornholdt*, 261 Kan. 644, 653, 932 P.2d 964 (1997).

Despite Daniels' failure to object to the admission of D.D.'s statements at trial, the Court of Appeals chose to address the argument because "failure of this court to consider this issue might result in a denial of the defendant's fundamental due process rights. [Citation omitted.]" Slip op. at 12. We disagree. As noted in *Bornholdt*, where a defendant fails to object to the introduction of a confession, this court has no obligation to become a finder of fact and make a determination of voluntariness where no record on the issue exists. 261 Kan. at 653. Had the trial court been given the opportunity to rule on the voluntariness of D.D.'s statements, it could have made factual findings and weighed the credibility of the witnesses. That would have given the appellate courts a starting point from which to review the issue. Instead, the Court of Appeals had to make its own factual findings from a cold record. We decline to follow the approach taken by the Court of Appeals and instead hold that Daniels has failed to preserve this issue for appeal.

*Did the District Court Err in Denying Daniels'*
*Motion for Mistrial Based Upon the Misconduct*
*of a Prosecution Witness?*

Daniels argues that the trial court erred in denying her motion for a mistrial. A trial court's decision on a motion for mistrial is reviewed under an abuse of discretion standard. Before an appellate court will find an abuse of discretion, the defendant has the

burden of showing substantial prejudice. *State v. Manning,* 270 Kan. 674, 696, 19 P.3d 84 (2001).

Daniels contends that Detective Brown made erroneous and irrelevant comments which prejudiced Daniels and denied her of her right to a fair trial. According to Daniels, there were three separate occasions when defense counsel had to object to false or irrelevant testimony by Detective Brown. Daniels requested a mistrial after the third such incident, and the Court of Appeals considered only that incident.

The first incident to which Daniels refers occurred when Detective Brown, who had interviewed Daniels, testified about what Daniels told him she and D.D. had been doing on the day of the robbery. Brown testified that Daniels said that she and D.D. had been at the law enforcement center "just long enough." At this point, defense counsel interjected and asked to approach the bench. Defense counsel was apparently concerned that Brown was going to reveal that Daniels and D.D. had been at the law enforcement center in connection with a diversion agreement involving D.D. The court took a 5-minute recess so that Brown could be instructed not to reveal that information, and in his subsequent testimony, Brown made no mention of the diversion agreement.

The second incident occurred when defense counsel was crossexamining Brown about his reasons for believing that Daniels had masterminded the robbery. Among other reasons, Brown stated that Daniels "was the only one driving after the bank stop and was identified as the one who did drive up to the alley and let them out." Defense counsel then exchanged words with the prosecutor about whether there had been any evidence introduced that anyone had identified Daniels as the driver of the vehicle. Defense counsel stated, "We have an officer that said no one was in the vehicle. We have an officer who clearly stopped her and searched the vehicle, and we have an individual at D & D Tire before the robbery was committed that said he couldn't tell who was driving." The trial court agreed, stating, "I think that is true," and the crossexamination proceeded.

The third incident which prompted defense counsel to ask for a mistrial requires a bit more background information. The Court of Appeals summarized the facts as follows:

"At the beginning of trial, the State filed a late motion to endorse Dante Daniels as a witness. The district court denied the endorsement as prejudicial to the defense. Later in the trial, the State produced evidence suggesting that Dante had been involved in the robbery along with Moss.

"The State examined Detective Brown about his interrogation of the defendant, and the detective explained that the defendant became forcefully unruly when she was told that Dante had been brought to the station for questioning. The detective testified that the defendant shouted to Dante that he should not tell the police anything.

"Therefore, during the cross-examination of Detective Brown, defense counsel questioned the officer about possibly innocent explanations for the defendant's behavior during her interrogation. One of the questions concerned the police investigation of one of the defendant's sons, Dante, who was suspected of committing the robbery. The purpose of this questioning was to suggest to the jury that the defendant was righteously indignant because she had been cooperative with the police investigation but that the detectives refused to believe her and had even begun to harass her family by interrogating them, unnecessarily.

"In response, the detective replied:

'At the time we told [the defendant], we said we suspected or had a feeling that Dante was involved, but she told us he was in school. To be honest with you, at that time, we didn't know who the second person was. We didn't know who the small black child or the person running with Moss was until we-other interviews firmed that up.'

"After this statement, defense counsel moved for a mistrial. The district court found that the detective's statements could be cured by a limiting instruction and refused to grant the defense motion for mistrial." Slip op. at 16-17.

The Court of Appeals found that the detective's statements, "while improper, were a natural attempt to rebut the clear implication of the defense questions." Slip op. at 17. Furthermore, the court noted that the jury had already heard about D.D.'s statements that his mother had dropped off both Dante and Moss in the alley. Thus, the Court of Appeals found it unlikely that the detective's improper comment about Dante's involvement had affected the jury's verdict. Because a reasonable person could agree that the detective's statement did not require a mistrial, the Court of Appeals found no abuse of discretion. Slip op. at 18.

Daniels now complains that the Court of Appeals did not consider the two other incidents involving Detective Brown. However, neither of those incidents reveal any prejudice to Daniels. In the first incident, Detective Brown never mentioned D.D.'s diversion

agreement, and, in the second incident, the trial court clarified that Daniels had not been identified as the driver of the car which dropped off Moss and Dante. As to the third incident, Daniels has failed to establish that the trial court abused its discretion in refusing to grant a mistrial. The Court of Appeals' analysis of the issue was correct.

### Were Daniels' Convictions of Aiding and Abetting Aggravated Robbery and Conspiracy to Commit Aggravated Robbery Supported by Sufficient Evidence?

Next, Daniels argues that there was insufficient evidence to support her convictions of aiding and abetting aggravated robbery and conspiracy to commit aggravated robbery. "When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Beach*, 275 Kan. 603, Syl. ¶ 2, 67 P.3d 121 (2003).

First, Daniels contends that the abrasion to the victim's head was not sufficiently serious to constitute the bodily harm element of aggravated robbery. Second, Daniels contends there was insufficient evidence to prove that Dewayne Moss committed the underlying aggravated robbery; therefore, there was also insufficient evidence to prove that she aided and abetted and conspired with him to commit the robbery. Specifically, Daniels notes that Moss has a noticeable growth on the left side of his face which one would expect an eyewitness to mention. None of the eyewitnesses mentioned seeing this growth.

With regard to this argument, the Court of Appeals recapped the evidence as follows:

"In support of the 'bodily harm' element, the record demonstrated that the victim had been pushed to the ground and had hit his head, causing an abrasion. As previously discussed, whether the injury was more significant than 'trivial bruises or impressions' incidental to the force necessary to accomplish the robbery is a jury determination. See *State v. Peltier*, 249 Kan. 415, 422-23, 819 P.2d 628 (1991). Had the jury been properly instructed, the record could easily bear out a determination that the victim had suffered bodily injury in the attack.

"Similarly, although none of the eyewitnesses to the crime specifically identified Moss or Dante, each described two black males wearing similar clothing, one being approximately 5 or 6 inches shorter than the other. At roughly the same time of day, an employee of the D & D Tire Shop witnessed a blue, 4-door Chevrolet Malibu pull up to the alley in which the robbery occurred and noticed that two individuals, with descriptions similar to later descriptions of the perpetrators of the robbery, exited the vehicle and headed in the direction of the alley.

"Also at the approximate time of the robbery, Kitsmiller witnessed two African-American males running out of the alley where the robbery occurred; they continued past her, east on 10th Street, before she lost sight of them. Shortly thereafter, Officer Craig Shanks positively identified Moss running with another African-American who was dressed similarly to Moss. The two individuals ran across New Hampshire near or on 10th Street.

"The defendant owns a blue, 4-door Chevrolet Malibu, and she was videotaped at the bank standing directly behind the victim of the robbery moments before the crime occurred. The individuals who committed the robbery seemingly knew which pocket the victim had put his money because they immediately reached into that pocket and retrieved the cash without searching his other pockets for additional items of value.

"From this circumstantial evidence, a reasonable jury could have found beyond a *reasonable* doubt that the defendant had witnessed the victim's bank transaction, had told Moss and Dante about the transaction and which pocket the victim had placed the money and had driven them around the corner to the alley down which the victim was walking, so that the men could rob the victim.

"In addition, the jury may have adopted Detective Flachsbarth's and Officer Sayler's versions of D.D.'s testimony in which he informed them of the defendant's, Moss', and Dante's involvement in the crime and ultimately showed the officers where the defendant left the other two men outside the alley.

"Consequently, the record contains sufficient evidence to lead a reasonable person to conclude that Moss and Dante had committed the robbery against the victim at the instigation of, and with the assistance of, the defendant." Slip op. at 19-21.

Daniels has failed to demonstrate that the Court of Appeals' conclusion was erroneous. The record contains sufficient evidence to support her convictions of aiding and abetting and conspiracy to commit aggravated robbery.

### *Was Daniels' Conviction of Endangering a Child Supported by Sufficient Evidence?*

Finally, Daniels argues that there was insufficient evidence to support her conviction of endangering a child. Daniels was charged

in a single count with endangering both D.D. and Dante in violation of K.S.A. 21-3608. The jury was instructed that in order to find Daniels guilty, it must find "[t]hat the defendant intentionally and unreasonably caused or permitted Dante and [D.D.] to be placed in a situation in which there was a reasonable probability that Dante and [D.D.'s] life, body or health would be injured or endangered."

The Court of Appeals agreed that the evidence was insufficient to establish that Daniels endangered D.D. because D.D. stayed in the car and there was no evidence that he was a party to the discussion about the robbery or that he witnessed it. The Court of Appeals understandably reached a different conclusion as to whether Daniels endangered Dante, since Daniels asked Dante to participate in the robbery. Slip op. at 24.

The Court of Appeals also stated that any multiple acts problem arising out of the charging of a single count of child endangerment which included factual allegations as to both Dante and D.D. was resolved because the jury was given a unanimity instruction. Finally, the Court of Appeals stated that any error was harmless because, if the jury believed that Daniels endangered D.D., it must also have believed that Daniels endangered Dante. Slip op. at 25.

In her petition for review, Daniels argues this was not a multiple acts case; therefore, the fact that the jury was given a unanimity instruction was irrelevant. Daniels argues that because the evidence was insufficient to establish that she endangered D.D., her conviction must be vacated.

In a multiple acts case, several acts are alleged and any one of them could constitute the crime charged. In such a case, the jury must be unanimous as to which act constitutes the crime. To ensure jury unanimity, either the jurors must be instructed that all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt or the State must be required to elect the particular act upon which it will rely. *State v. Timley*, 255 Kan. 286, 289-90, 875 P.2d 242 (1994).

The problem in this case is most aptly described as duplicity:

"A complaint which charges two separate and distinct offenses in a single count is duplicitous. Duplicity is the joinder of two or more separate and distinct offenses

in the same count, not the charging of a single offense involving a multiplicity of ways and means of action. Duplicitous charging is bad practice because it confuses the defendant as to how he or she must prepare a defense, and it confuses the jury." *State v. Anthony*, 257 Kan. 1003, Syl. ¶ 9, 898 P.2d 1109 (1995).

In this case, Daniels was alleged to have committed a single criminal act, the planning of an aggravated robbery, which endangered both D.D. and Dante. Because there were two different victims involved, the State could have charged Daniels with two separate counts of child endangerment.

The remedy for duplicity is not dismissal of the count, but rather to require the State to elect upon which act it will rely. *State v. Hammond*, 4 Kan. App. 2d 643, 646-47, 609 P.2d 1171, *rev. denied* 228 Kan. 807 (1980) (citing 1 Wright, Federal Practice and Procedure: Criminal § 145 [1969]). As this court explained in *State v. Campbell*, 217 Kan. 756, 778, 539 P.2d 329 (1975), "[t]he vice of duplicity is that the jury is unable to convict of one offense and acquit of another offense where both are contained in the same count."

Clearly, that was the potential problem in this case. The jury could not convict Daniels of endangering one child but acquit her of endangering the other because both offenses were contained in the same count. If the jury instruction had charged Daniels with endangering D.D. *or* Dante, then it would be impossible to determine which charge the jury had agreed upon. However, as instructed, we have the required assurance of jury unanimity. The jury was instructed that it must find that Daniels endangered both Dante *and* D.D. Since a jury is generally presumed to have followed the instructions given by the trial court *(State v. Fulton,* 269 Kan. 835, 842, 9 P.3d 18 [2000]), we conclude that the jury found Daniels guilty of endangering both D.D. and Dante.

We do not agree with the Court of Appeals' conclusion that the evidence was insufficient to support Daniels' conviction of endangering D.D. K.S.A. 21-3608 defines the crime of endangering a child as "intentionally and unreasonably causing or permitting a child under the age of 18 years to be placed in a situation in which the child's life, body or health may be injured or endangered." In *State v. Sharp*, 28 Kan. App. 2d 128, 135, 13 P.3d 29 (2000), the

Court of Appeals concluded that there must be a reasonable probability that the harm will result or the child will be placed in imminent peril. The pattern instruction, PIK Crim. 3d 58.10, which was followed in this case, was modified to reflect this standard. When the evidence is viewed in the light most favorable to the prosecution, a reasonable factfinder could reach the conclusion that both children were endangered. Daniels planned the participation of one minor in the crime and the other, D.D., was in the car during the commission of numerous acts which were the basis of the charges that Daniels aided and abetted and conspired to commit the crime of aggravated robbery, a crime defined by our legislature as "inherently dangerous" (see K.S.A. 2003 Supp. 21-3436), including transporting the assailants to the alleyway where the aggravated robbery occurred.

Affirmed.