NOT DESIGNATED FOR PUBLICATION

No. 121,540

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DALTON XAVIER LAX,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; CHERYL A. RIOS, judge. Opinion filed December 18, 2020. Affirmed in part, reversed in part, and remanded with directions.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., MALONE, J., and MCANANY, S.J.

PER CURIAM: Dalton Xavier Lax appeals his convictions of attempted first-degree murder, aggravated battery, criminal discharge of a firearm at an occupied dwelling, and criminal possession of a firearm. Lax claims: (1) the complaint charging him with attempted first-degree murder was duplicitous; (2) the district court gave a clearly erroneous jury instruction defining premeditation; and (3) the district court violated his constitutional right to a jury trial by accepting his stipulation to two elements of criminal possession of a firearm without first obtaining a knowing and voluntary waiver of his right to a jury trial. We find that Lax is entitled to relief on his third claim, but we otherwise affirm the district court's judgment.

1

The events that led to Lax's convictions began with the February 2016 murder of DelJuan Patton, a member of the Topeka street gang known as the Four Corner Hustlers. Patton's father was a leader of the Four Corner Hustlers, and Patton's brother and Lax were members as well. Lax and Patton were close friends; Lax described him as "like a brother." Rumor had it that Trevon Praylow, a member of rival street gang the Gangster Disciples, or another Gangster Disciple was involved in Patton's murder.

This case arises from two separate shootings involving Praylow. On May 3, 2016, Praylow drove to the hospital in a red Pontiac Grand Prix and received treatment for a gunshot wound to his back. He told police he had been at a park waiting for his child to arrive and he did not know who shot him. The same day, two witnesses came forward and reported to police that an individual in a white vehicle had shot at an individual in a red vehicle near the intersection of Fillmore Street and 16th Street, but neither witness could identify the individuals involved. Police collected a shell casing from the road near the intersection and, while processing Praylow's car, found a projectile in the driver's door.

The second shooting occurred on June 25, 2016, the day after what would have been Patton's birthday. Praylow was staying at his sister's duplex on Southeast 44th Terrace with his sister, her children, and her boyfriend. In the early morning hours, Praylow heard gunshots outside the duplex. Praylow's sister called the police, but Praylow told them he did not know what happened. Police collected shell casings from the scene and documented at least six bullet holes in the home's living room window.

On August 24, 2016, Praylow was arrested and charged with criminal possession of a firearm. During an initial meeting with law enforcement about that case, Praylow identified Lax as the person who had shot him. According to Praylow, on May 3, 2016,

2

Lax pulled up next to him near the intersection of 16th and Fillmore Streets, driving a white Grand Prix, and shot him. As for the June 25, 2016 shooting at his sister's duplex, Praylow said he looked out a side door just after the shooting and saw Lax run away and get into the same white Grand Prix. Praylow explained that he had not at first identified Lax as the shooter because he wanted to retaliate personally, but after his own arrest he was more concerned with protecting his family and loved ones. Praylow believed that Lax had shot him and shot at his sister's home seeking revenge for Patton's murder.

On August 25, 2016, the State charged Lax with one count of intentional aggravated battery resulting in great bodily harm involving the May 3, 2016 shooting of Praylow. A felony arrest warrant was issued, and the next day Topeka police arrested Lax at a UPS store, where he was trying to ship a cell phone. Police seized the cell phone and Detective Patrick Ladd of the Topeka Police Department extracted information from the phone. The extraction revealed prior text messages between Lax and his girlfriend, Tiffany Hill, about her purchasing a gun for him.

In early September 2016, FBI agents told Detective Jason Judd of the Topeka Police Department that a man named Cleo Clemons was hiding a gun at his home and that the gun was related to Lax. On September 7, 2016, Judd went to Clemons' home and, after Clemons consented to a search, officers found a silver and black 40-caliber Smith and Wesson handgun in a filing cabinet in Clemons' bedroom closet. Clemons, a longtime family friend of Lax's mother, Leonna Donnelly, said that Donnelly had called him and asked him to pick up an unidentified item from under the porch of her home. When Clemons looked under Donnelly's porch, he found a gun wrapped in a hat and a shirt; he took the items home and put them in his filing cabinet. The police traced the gun and discovered that Hill had bought it at a pawn shop in Topeka in April 2016. Forensic testing showed that fired cartridge cases recovered at the scenes of the May 2016 and June 2016 shootings had been fired from the gun.

3

On September 21, 2016, Hill was indicted in federal court for making a straw purchase of the gun. Although at first reticent, Hill eventually admitted that she had bought the gun at Lax's request and had given the gun to Lax. Hill also said that Lax told her in May 2016 that he had just shot Praylow and in June 2016, Lax told her that he and a friend had shot at Praylow's sister's home. The white Grand Prix used in the shootings belonged to Hill, but she let Lax drive the car at the time.

On February 27, 2017, the State filed an amended complaint, charging Lax with one count of attempted first-degree murder, one count of intentional aggravated battery resulting in great bodily harm, one count of criminal discharge of a firearm at an occupied dwelling, and one count of criminal possession of a firearm. There were several pretrial motions filed in the case, but none related to this appeal.

The four-day jury trial began on May 14, 2018. The State presented evidence from 18 witnesses and over 100 exhibits establishing the above facts. The State also presented expert testimony regarding gang culture. Lax did not testify at trial, but he asserted a general denial defense to both shootings, attacking the credibility of Praylow and Hill as witnesses. During the jury instruction conference, Lax informed the district court that he wanted to stipulate to two elements of the charge of criminal possession of a firearm. Lax agreed to stipulate that he was convicted of a felony within the past 10 years and that he was not found to be in a possession of a firearm in that prior felony conviction.

The jury found Lax guilty of all charges. On August 30, 2018, the district court sentenced Lax to 554 months' imprisonment for attempted first-degree murder, to run concurrent with 38 months' imprisonment for aggravated battery, 11 months' imprisonment for criminal discharge of a firearm at an occupied dwelling, and 7 months' imprisonment for criminal possession of a firearm. Lax timely appealed the district court's judgment.

## WAS THE ATTEMPTED FIRST-DEGREE MURDER CHARGE DUPLICITOUS?

On appeal, Lax first claims that Count 1 of the amended complaint charging him with attempted first-degree murder was duplicitous. Count 1 charged Lax with attempted first-degree murder of Praylow committed between May 3, 2016 and June 25, 2016. Lax asserts that the complaint was duplicitous because it contained charges for two separate crimes of attempted first-degree murder in a single count. Lax's argument focuses only on the language of the amended complaint, he makes no challenge to the jury instructions. But in arguing that the error was not harmless, Lax asserts that the jury could have convicted him of attempted first-degree murder without unanimously agreeing on which allegation supported the charge.

For its part, the State agrees that Count 1 of the amended complaint is duplicitous but asserts that any error was harmless. Resolving whether Count 1 of the amended complaint is duplicitous requires examination of the charging document, which is a question of law. An appellate court exercises unlimited review over questions of law. *State v. Ruiz*, 51 Kan. App. 2d 212, 223, 343 P.3d 544 (2015).

Lax acknowledges that he did not raise this issue in district court. Generally, Kansas appellate courts do not address issues for the first time on appeal unless at least one of three recognized exceptions apply:

> """(1) [T]he newly asserted claim involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) the claim's consideration is necessary to serve the ends of justice or to prevent the denial of fundamental rights; or (3) the district court's judgment may be upheld on appeal despite its reliance on the wrong ground or reason for its decision.'" [Citation omitted.]" *State v. Harris*, 311 Kan. 371, 375, 461 P.3d 48 (2020).

Lax asserts that the first exception applies here, but he makes no argument to explain why. See *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018) (holding that the failure to explain why an issue should be considered for the first time on appeal is fatal). He also invokes the second exception "because duplicitous charges implicate the fundamental right to a unanimous verdict." The State asserts that we should not consider this issue for the first time on appeal because none of the exceptions apply.

The Kansas Supreme Court has stated that "the right to a unanimous jury verdict is statutory and not constitutional; therefore, the exception for review of issues involving fundamental rights [is] not implicated." *State v. Brown*, 298 Kan. 1040, 1055, 318 P. 3d 1005 (2014). This was so because the right to a unanimous jury verdict recognized in the federal courts under the Sixth Amendment to the United States Constitution was one of the few rights in the Bill of Rights that was never incorporated against the States through the Fourteenth Amendment. But in *Ramos v. Louisiana*, 590 U.S. ___, 140 S. Ct. 1390, 1397, 206 L. Ed. 2d 583 (2020), the United States Supreme Court held that the Sixth Amendment right to a jury trial, as incorporated against the States through the Fourteenth Amendment, requires a unanimous jury verdict to convict a defendant of a serious offense. Thus, a defendant charged in state court with a felony has a constitutional right to a unanimous jury verdict. Because Lax's duplicity claim implicates a fundamental constitutional right, we will consider the claim for the first time on appeal for this reason.

As stated above, Lax narrowly frames his argument as one challenging the complaint. He contends that the May 3, 2016 and the June 25, 2016 shootings "were two separate incidents and could have and should have been charged separately." He asserts that "the duplicity of the charging document prejudiced Mr. Lax by allowing the jury to convict him of one count of attempted first degree murder, even if it did not unanimously agree on which allegation supported that charge."

6

"A complaint which charges two separate and distinct offenses in a single count is duplicitous. Duplicity is the joinder of two or more separate and distinct offenses in the same count, not the charging of a single offense involving a multiplicity of ways and means of action." *State v. Daniels*, 278 Kan. 53, 71-72, 91 P.3d 1147 (2004). Our Supreme Court has explained that "'[t]he vice of duplicity is that the jury is unable to convict of one offense and acquit of another offense where both are contained in the same count.'" 278 Kan. at 72 (quoting *State v. Campbell*, 217 Kan. 756, 778, 539 P.2d 329 [1975], *superseded by statute on other grounds as recognized in State v. Butler*, 307 Kan. 831, 416 P.3d 116 [2018]). In *Daniels*, the duplicity occurred because the State charged Daniels, in a single count, with endangering two children, "D.D. *and* Dante." (Emphasis added.) 278 Kan. at 72. The problem was that "[t]he jury could not convict Daniels of endangering one child but acquit her of endangering the other because both offenses were contained in the same count." 278 Kan. at 72.

The State charged Lax with one count of attempted first-degree murder of Praylow occurring on or about the 3rd day of May 2016 *through* the 25th day of June 2016. Had the State charged Lax in one count with attempted first-degree murder of Praylow occurring on May 3, 2016 *and* June 25, 2016, it would be duplicitous because the jury could not acquit him of attempted first-degree murder on one date and find him guilty of attempted first-degree murder on the other date because both offenses were contained in the same count. But that is not the problem here. Count 1 of the amended complaint charging Lax with attempted first-degree murder does not fail because it is duplicitous.

Lax's actual grievance is that there were multiple acts—the May 3, 2016 shooting and the June 25, 2016 shooting—that could support the jury's guilty verdict on the attempted first-degree murder charge, so "we cannot know whether the jury was unanimous on either distinct act." Despite Lax's consistent focus on the alleged "duplicity" of the complaint, his jury unanimity argument is one more appropriate to a multiple acts challenge. "'When several acts are alleged, any of which could constitute the

crime charged, the court is presented with a multiple acts case.'" *State v. Cottrell*, 310 Kan. 150, 154, 445 P.3d 1132 (2019).

Our Supreme Court has set forth the appropriate analysis for a multiple acts challenge:

> "This court will apply a three-part test to determine when a multiple acts situation has occurred such that the jury must agree on the same underlying criminal act. First, the court must determine if the case truly involves multiple acts, *i.e.*, whether the defendant's conduct was part of one act or represents multiple acts which are separate and distinct from each other. Second, the court must consider whether error occurred, *i.e.*, whether there was a failure by the State to elect an act or a failure by the court to instruct. Third, the court must determine whether the error is reversible. *State v. Colston*, 290 Kan. 952, Syl. ¶ 2, 235 P.3d 1234 (2010), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016).

Lax's brief fails to adequately argue a multiple acts error. He does not engage in the appropriate multiple acts analysis and he cites no legal authority to support a multiple acts claim. In fact, Lax's brief never refers to any claimed multiple acts violation. As the State points out in its brief, any attempt by Lax to now raise a multiple acts issue should be deemed waived or abandoned. See *State v. Salary*, 309 Kan. 479, 481, 437 P.3d 953 (2019) (stating that issues not adequately briefed are deemed waived or abandoned).

But even if we charitably construed Lax's brief as raising a multiple acts issue, he would not be entitled to any relief. Let's assume that Lax's attempted first-degree murder charge involves multiple acts and we have error because the State failed to elect an act to support the charge and the district court failed to instruct on jury unanimity. This leaves us to determine whether the error is reversible.

In older cases, our Supreme Court determined that the ultimate test for harmlessness when a unanimity instruction was not requested or given is the "clearly erroneous" standard as articulated by the Kansas Legislature in K.S.A. 22-3414(3). See *State v. Voyles*, 284 Kan. 239, Syl. ¶ 3, 160 P.3d 794 (2007). But in more recent multiple acts cases, our Supreme Court has applied the harmless error standard in *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012). See *State v. Moyer*, 306 Kan. 342, 359, 410 P.3d 71 (2017). Because the right to jury unanimity is now considered a fundamental constitutional right, a court will declare an error harmless only when the party benefiting from the error persuades the court "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., proves there is no reasonable possibility that the error affected the verdict." *Ward*, 292 Kan. at 569.

The trial evidence against Lax supporting his conviction of attempted first-degree murder can fairly be described as overwhelming. Praylow testified that on May 3, 2016, Lax pulled up next to him near the intersection of 16th and Fillmore Streets, driving a white Grand Prix, and shot him. Two independent witnesses confirmed that an individual in a white vehicle fired the shots that day. Praylow also testified that he looked out the door just after the June 2016 shooting and saw Lax run away and get into the same white Grand Prix. Praylow testified that the shootings were in retaliation for the prior gang shooting in which Praylow's friend, Patton, was killed.

The police later discovered that the white Grand Prix was owned by Hill, Lax's girlfriend. The police also discovered text messages on Lax's phone between Lax and Hill about Hill purchasing a gun for Lax. After receiving a tip, the police found the gun at Clemons' home. Clemons is a longtime friend of Lax's mother, Donnelly, and Clemons testified that Donnelly asked him to hide the gun at his house. The police traced the gun and discovered that Hill had bought it at a pawn shop in Topeka in April 2016. Forensic testing showed that fired cartridge cases recovered at the scenes of both shootings had

been fired from the same gun. Hill eventually admitted to police that she bought the gun at Lax's request and had given the gun to Lax. Hill also testified that Lax told her in May 2016 that he had just shot Praylow, and she testified that Lax told her in June 2016 that he was involved in the shooting at Praylow's sister's home.

As the State points out in its brief, Lax did not have separate defenses for each shooting; Lax generally denied that he committed any of the charged crimes. A multiple acts error may be harmless when the defendant presents a general denial defense and the case involves a credibility contest between the defendant and the victim. *Voyles*, 284 Kan. at 253. Kansas appellate court are "less inclined to reverse a multiple acts error where the defendant presented a unified defense, *e.g.*, a general denial." *Moyer*, 306 Kan. 362-63. Lax presented just such a defense; he argued at trial that he "did not commit the crimes that he's been charged with" and attacked the credibility of Praylow and Hill.

Lax points out in his brief that during deliberations, the jury asked a question about how it should answer the verdict form if it was not unanimous on a specific count. Lax asserts that this question showed that the jury may not have been unanimous on which act supported the attempted first-degree murder charge. But as the State replies in its brief, Lax's argument is speculative. We cannot read anything definite into the jury's question and it could have been related to any of the charges submitted to the jury. Moreover, reversibility analysis of a multiple acts error does not require this court to know for certain whether the jury was unanimous. Rather, we must consider the entire record and determine whether there is a "reasonable possibility that the error affected the verdict." *Ward*, 292 Kan. at 569. In Lax's case, we find there is not.

In sum, we find that the amended complaint charging Lax with attempted first-degree murder was not duplicitous. Lax is not entitled to a new trial on this ground. We also find that Lax has waived or abandoned any claim of a multiple acts error. But even if the issue has not been waived, we find that any multiple acts error on the attempted first-

degree murder charge did not affect the verdict based on the entire record and was harmless beyond a reasonable doubt.

WAS THE JURY INSTRUCTION ON PREMEDITATION CLEARLY ERRONEOUS?

Lax next claims the district court gave a clearly erroneous jury instruction defining premeditation. In the jury instruction on attempted first-degree murder, the district court defined premeditation as "mean[ing] to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

Lax now argues that the jury instruction given by the district court "does not adequately draw a distinction between a premeditated, intentional killing and an intentional killing." He asks that this court reverse his conviction of attempted first-degree murder and remand for a new trial. The State responds that the Kansas Supreme Court's holding in *State v. Uk*, 311 Kan. 393, 461 P.3d 32 (2020), controls and requires this court to reject Lax's argument.

When reviewing jury instructions:

"'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in [*State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011)].'
    "'The first element of this analysis ultimately affects the last one "in that whether a party has preserved an issue for review will have an impact on the standard by which

11

we determine whether an error is reversible.' [Citations omitted.]" *Uk*, 311 Kan. at 396-97.

Lax acknowledges that he did not object at trial to the definition of premeditation in the jury instructions. Thus, if this court finds error, it should reverse only if there was clear error, meaning that this court is ""'firmly convinced that the jury would have reached a different verdict had the instruction error not occurred."'" *Uk*, 311 Kan. at 401 (quoting *State v. Williams*, 208 Kan. 1439, 1451, 430 P.3d 448 [2018]).

Next, turning to whether the instruction was legally appropriate, Lax sets forth a three-page historical survey of Kansas courts' understanding of the term premeditated, noting that early definitions of premeditation conceived of an act that was planned or schemed about ahead of time, while the current pattern jury instruction—and the definition given at Lax's trial—defines premeditation as having "thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act." See PIK Crim 4th 54.150(d) (2018 Supp). Lax argues that this definition renders premeditated acts materially indistinguishable from intentional acts, which K.S.A. 2019 Supp. 21-5202(h) defines as those that occur when a person has a "conscious objective or desire to engage in the conduct or cause the result." This is so, according to Lax, because thinking the matter over beforehand necessarily occurs when a person has a conscious objective or desire to engage in the conduct or cause the result.

After Lax filed his appellate brief, the Kansas Supreme Court rejected the same argument in *Uk*, a case in which the jury received the same definition of premeditation as did Lax's jury. See 311 Kan. 393, 396. In his direct appeal, Sonny Uk argued that the definition of premeditation given to the jury left it "unable to distinguish between premeditated (first-degree) murder and intentional (second-degree) murder," because without language defining premeditation to include prior planning or scheming, premeditation is the same as intent. 311 Kan. at 401. Our Supreme Court stated:

12

"The court has previously expressed strong general support for the use of PIK instructions by district courts. The ultimate goal of any jury instruction is effective communication. That goal is achieved through words given and understood in context. Though the words 'intent' and 'intentional' are both used within the two sentences comprising [the jury instruction defining premeditation], the meaning of those two words is communicated within the context of the other words that are also used. Those other words leave no doubt that 'premeditation'—as a thought process conducted some time before an act—is clearly different from the intentional nature of the act itself. Thus, the instruction fairly and clearly sets forth the law, and no reasonable jury would have trouble distinguishing the conduct described by [the jury instruction defining premeditation] from the statutory definition of intentional conduct set forth in K.S.A. 2019 Supp. 21-5202(h).

"We thus find [the jury instruction defining premeditation] to be legally appropriate. Lacking a challenge to its factual appropriateness, we find no error—let alone clear error—in the district court's decision to issue an essentially unmodified PIK Instruction on the definition of premeditation. Accordingly, we need not address harmlessness." 311 Kan. at 401-02.

As the State points out in its brief, *Uk* is directly on point, addressed arguments identical to those Lax raises in this appeal, and is controlling. Lax did not file a reply brief or otherwise respond to the State's assertion. Moreover, like Uk, Lax does not argue that the instruction was factually inappropriate, only that it was legally inappropriate. Under *Uk*, Lax's arguments fail. The district court did not err in how it defined premeditation for the jury, much less commit clear error.

## DID THE STIPULATION TO THE ELEMENTS OF CRIMINAL POSSESSION OF A FIREARM VIOLATE LAX'S CONSTITUTIONAL RIGHT TO A JURY TRIAL?

Finally, Lax claims the district court violated his constitutional right to a jury trial by accepting his stipulation to two elements of criminal possession of a firearm without first obtaining a knowing and voluntary waiver of his right to a jury trial. During the jury instruction conference, Lax informed the district court that he wanted to stipulate to two

elements of the charge of criminal possession of a firearm. Lax agreed to stipulate that he was convicted of a felony within the past 10 years and that he was not found to be in possession of a firearm in that prior felony conviction. As a result, the district court's jury instruction on criminal possession of a firearm included the following stipulation:

"Stipulation No. 1

"The following facts have been agreed to by the parties and are to be considered by you as true:

"1. That within ten years proceeding [*sic*] on or about the 3rd day of May, 2016 and on or about the 25th day of June, 2016, the defendant, Dalton Lax, had been convicted of a felony, to wit: Shawnee County case 08CR549. Defendant further stipulates he was not found to be in possession of a firearm in case number 08CR549."

Lax now argues that the district court erred by accepting the stipulation reflected in this jury instruction without first obtaining from him a waiver of his right to a jury trial. He cites *State v. Johnson*, 310 Kan. 909, 453 P.3d 281 (2019), to support his claim and asks this court to reverse his conviction of criminal possession of a firearm.

Once again, Lax acknowledges that he did not raise this issue at trial. As already stated above, Kansas appellate courts seldom address issues for the first time on appeal unless at least one of three recognized exceptions apply. See *Harris*, 311 Kan. at 375. Lax asserts that the first two exceptions apply here. Because the right to a jury trial is a fundamental right, we will address Lax's claim for the first time on appeal. See 311 Kan. at 375 (recognizing "'the fundamental nature of the right to jury trial'").

To its credit, the State concedes that Lax is entitled to relief under *Johnson*. In that case, the Kansas Supreme Court determined that "when a defendant stipulates to an element of a crime, the defendant has effectively given up his or her right to a jury trial on that element. [Citations omitted.]" 310 Kan. at 918-19. The *Johnson* court also stated

14

that "because every defendant has the fundamental right to a jury trial, courts cannot accept a jury trial waiver "'unless the defendant, after being advised by the court of his right to trial by jury, personally waives his right to trial by jury, either in writing or in open court for the record.'" [Citation omitted.]" 310 Kan. at 919.

Lax stipulated to two elements of the crime of criminal possession of a firearm when he stipulated that (1) within 10 years before the dates of his current charges he was convicted of a felony in Shawnee County case No. 08CR549 and (2) he was not found to be in possession of a firearm with respect to that prior conviction. Because the district court did not advise Lax of his right to a jury trial on all the elements of criminal possession of a firearm and it did not properly obtain his personal waiver of that right, the district court violated Lax's fundamental right to a jury trial. *Johnson*, 310 Kan. at 918-19.

The State contends that *Johnson* was wrongly decided. But this court is duty bound to follow Kansas Supreme Court precedent unless there is some indication that the court is departing from its previous position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). We have no reason to believe that our Supreme Court is wavering on its recent unanimous decision in *Johnson*. As a result, we reverse Lax's conviction of criminal possession of a firearm and remand for further proceedings. The State may retry Lax on this charge, but if the parties stipulate to any elements of the charge, the district court must advise Lax of his right to a jury trial on the stipulated elements and Lax must personally waive his right to a jury trial, either in writing or in open court on the record.

Affirmed in part, reversed in part, and remanded with directions.

15